**SIERRA CLUB, a California corporation, Appellee,**

v.

**Walter J. HICKEL, individually, and as Secretary of the Interior of the United States, John S. McLaughlin, individually, and as Superintendent of Sequoia National Park, Clifford M. Hardin, individually, and as the Secretary of Agriculture of the United States, J. W. Deinema, individually, and as Regional Forester, Forest Service, and M. R. James, individually, and as Forest Supervisor of the Sequoia National Forest, Appellants.**

**No. 24966.**

United States Court of Appeals, Ninth Circuit.

Sept. 16, 1970.

Walter Kiechel, Jr. (argued), Deputy Asst. Atty. Gen., S. Billingsley Hill, Jacques B. Gelin, Attys., Dept of Justice, Shiro Kashiwa, Asst. Atty. Gen., Lands & National Resources Division, Washington, D. C., James L. Browning, U. S. Atty., San Francisco, Cal., for appellants.

Leland R. Selna, Jr. (argued), Leo E. Borregard, Matthew P. Mitchell, Howard M. Wexler, of Feldman, Waldman & Kline, Robert W. Jasperson and Gregory Archbald, San Francisco, Cal., for appellee.

Calvin E. Baldwin, County Counsel, County of Tulare, Visalia, Cal., E. Lewis Reid and Richard G. Hildreth of Steinhart, Goldberg, Feigenbaum & Ladar, San Francisco, Cal., amicus curiae for County of Tulare.

John G. Schwartz, San Mateo, Cal., amicus curiae for Far West Ski Assn. and U. S. Ski Assn.

Before HAMLEY, KILKENNY and TRASK, Circuit Judges.

TRASK, Circuit Judge:

This is an appeal from an order of the district court granting a preliminary injunction. The action was instituted by a verified complaint filed by the Sierra Club, a non-profit California corporation, against Walter J. Hickel, individually, and as Secretary of the Interior; Clifford M. Hardin, individually, and as Secretary of Agriculture; and the Superintendent of the Sequoia National Park and Supervisor of the Sequoia National Forest.

The relief sought was a declaratory judgment and preliminary and permanent injunctions enjoining issuance of the permits required for implementation of a plan proposed by Walt Disney Productions, Inc., for a large scale commercial-recreational development in and near Mineral King Valley in the Sequoia National Game Refuge located within Sequoia National Forest in California. The development also involved a proposed road which would in part traverse a portion of Sequoia National Park.

Amicus curiae briefs supporting the position of the defendants-appellants were filed by the United States Ski Association, the Far West Ski Association and the County of Tulare.

Jurisdiction of the district court was asserted under Section 10 of the Administrative Procedure Act, 5 U.S.C. §§ 701–706; under the Federal Question Statute, 28 U.S.C. § 1331(a); the 1962 Mandamus Act, 28 U.S.C. § 1361; and under the Declaratory Judgments Act, 28 U.S.C. § 2201. Jurisdiction of this court rests on 28 U.S.C. § 1292(a) (1) authorizing interlocutory appeals from orders granting injunctions.

A brief summary of the controversy is as follows: In February 1965, the Forest Service of the Department of Agriculture published a prospectus inviting interested parties to submit proposals for the development of an all-year recreational project in Mineral King Valley in the Sequoia National Forest, in accordance with certain minimum requirements as estab-

lished by the prospectus. Walt Disney Productions (Disney) and five other bidders submitted proposals in response to the prospectus. After careful study the Secretary of Agriculture determined the Disney proposal to be the best. Thereafter, on October 10, 1966, a special use permit for planning was issued to Disney for a term of three years in order to enable Disney to make the necessary studies to prepare a master plan for the project which would meet with Forest Service approval. The plan was duly submitted and approved by the Forest Service on January 21, 1969, and is the plan that is the subject of this litigation.

In connection with the plan, the Department of the Interior has proposed to permit the State of California to construct a new access road to Mineral King Valley. The new highway would be 20.4 miles long, of which 6.5 miles would cross Bureau of Land Management (Department of Interior) land, 9.2 miles would cross Sequoia National Park (Department of Interior) land, 1.8 miles would cross Sequoia National Forest (Department of Agriculture) land, and the remaining 2.9 miles would cross various parcels of private property. It would approximately parallel the existing Mineral King roadway which appears on the map (See Record 115) to be a tortuous road now described as substandard. In connection with the project, the Secretary of the Interior also agreed to grant a right of way for electrical transmission lines through the park.

In announcing the master plan and its approval, the Forest Service stated:

"Our goal is to provide a needed public service so that the scenic, aesthetic, and recreational resources of Mineral King can be enjoyed by the American people as part of their heritage. At the same time, we intend to work with the Disney organization to assure that the development can be accomplished without substantial impairment or permanent undesirable ecological impact. We are confident that these twin challenges have been faced in a creative and artistic fashion." (T.R. 52.)

The initial description of the facilities proposed stated that accommodations would be provided for 1,505 overnight guests plus day visitors. A sub-level automobile reception center would be provided outside of the main Mineral King Valley with a cog-assist railway to transport people to the main village. No visitor automobiles would be allowed in Mineral King Valley proper. The announcement of the Forest Service continued:

"While the Mineral King area is certain to become increasingly popular, its ultimate development will be guided by aesthetic and ecological limitations, rather than market potential. The Disney master plan has been designed with this consideration uppermost."

On the merits, the Sierra Club contends that the Secretary of Agriculture who has the responsibility under Congress for management of the national forests has exceeded his authority and has acted illegally as well as arbitrarily and capriciously in approving the master plan proposed by Disney. It urges that the Secretary of Agriculture's proposal to issue a term permit for an eighty acre parcel for a term of thirty years for construction of improvements such as hotels, pools and parking lots, and to issue a revocable permit for additional acreage upon which such improvements as ski lifts, trails, and sewage treatment facilities would be built, would constitute illegal action in excess of authority. Second, the Sierra Club asserts that the action of the Secretary of the Interior in his proposal to permit the State of California to construct a road across Sequoia National Park for a distance of 9.2 miles to replace an existing road across the park would be illegal. Finally, the club asserts that no authority exists for the Secretary of the Interior to issue a permit for the construction of a transmission line across the park lands as a part of the master plan.

Encompassing all is the vehement argument of Sierra that the necessary result of the development proposal is the "permanent destruction of natural val-

ues" and the "irreparable harm to the public interest." These, it is asserted, are "irreversible effects of administrative lawlessness."

Article IV, Section 3 of The United States Constitution commits the management and control of the lands of the United States to Congress. That congressional power is unlimited. The Supreme Court said in Gibson v. Chouteau, 80 U.S. (13 Wall.) 92, 99, 20 L.Ed. 534 (1872):

> "With respect to the public domain, the Constitution vests in Congress the power of disposition and of making all needful rules and regulations. That power is subject to no limitations."

See also Alabama v. Texas, 347 U.S. 272, 274, 74 S.Ct. 481, 98 L.Ed. 689 (1954).

■ Congress may delegate the power to manage federal lands to the Executive. Best v. Humboldt Placer Mining Co., 371 U.S. 334, 336–338, 83 S.Ct. 379, 9 L.Ed.2d 350 (1963). With respect to the national forests, Congress has authorized the Secretary of Agriculture "to regulate their occupany and use." Organic Administration Act, 16 U.S.C. § 551. With respect to national parks, Congress has authorized the Secretary of the Interior "to promote and regulate the use" of such parks, to "grant privileges, leases, and permits for the use of land" in the parks, and to cooperate with the Secretary of Agriculture in administering contiguous national forests. Organic Act of the National Park Service, 16 U.S.C. § 1 et seq.

The Secretaries purport to act pursuant to these basic sources of authority, together with supplemental legislative support.

### (1) *Standing*

■ Appellants have raised the threshold question as to whether appellee has sufficient legal standing to bring this action. There is no dispute that Sierra Club is a legally organized and existing corporation. If an interest of such a corporate person, entitled to legal protection, is damaged or denied, that corporation is entitled to redress in the courts.

> "The only problems about standing should be what interests deserve protection against injury, and what should be enough to constitute an injury." [1]

Simply stated but difficult to apply, standing has been called "one of the most amorphous concepts in the entire domain of the public law." [2]

The basic concept of standing was summarized in Associated Industries v. Ickes, 134 F.2d 694, 700 (2d Cir. 1943) as follows:

> "In a suit in a federal court by a citizen against a government officer, complaining of alleged past or threatened future unlawful conduct by the defendant, there is no justiciable 'controversy,' without which under Article III, § 2 of the Constitution, the court has no jurisdiction, unless the citizen shows that such conduct or threatened conduct invades or will invade a private substantive legally protected interest of the plaintiff citizen; such invaded interests must be either of a 'recognized' character, at 'common law' or a substantive private legally protected interest created by statute."

In that same case, in order to reconcile previous decisions of the Supreme Court where an individual was permitted to assert a position which appeared to protect a public interest rather than a traditional, substantive legally-protected interest of a citizen-plaintiff, the court suggested the "private Attorney Generals" theory, as follows:

> "While Congress can constitutionally authorize no one, in the absence of an actual justiciable controversy, to bring a suit for the judicial determination either of the constitutionality of a statute or the scope of powers conferred by

---

1. Davis, The Liberalized Law of Standing, 37 U.Chi.L.Rev. 450, 468 (1970).

2. Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 373, 424 F.2d 859, 861 (1970).

a statute upon government officers, it can constitutionally authorize one of its own officials, such as the Attorney General, to bring a proceeding to prevent another official from acting in violation of his statutory powers; for then an actual controversy exists, and the Attorney General can properly be vested with authority in such a controversy, to vindicate the interest of the public or the government. Instead of designating the Attorney General, or some other public officer, to bring such proceedings, Congress can constitutionally enact a statute conferring on any non-official person, or on a designated group of non-official persons, authority to bring a suit to prevent action by an officer in violation of his statutory powers; for then in like manner there is an actual controversy, and there is nothing constitutionally prohibiting Congress from empowering any person, official or not, to institute a proceeding involving such a controversy, even if the sole purpose is to vindicate the public interest. Such persons, so authorized, are, so to speak, private Attorney Generals." 134 F.2d at 704.

Such a notion would support the rationale of many cases, but not all. More recently, the amendment to the Administrative Procedure Act, and particularly Section 10, thereof, 5 U.S.C. §§ 701–706, together with a profusion of cases relying upon it and interpreting it, have developed new precedents on the law of standing. See, e. g., Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); Citizens Committee for Hudson Valley v. Volpe, 425 F.2d 97 (2d Cir. 1970); Scanwell Laboratories, Inc., v. Shaffer, 137 U.S. App.D.C. 371, 424 F.2d 859 (1970). See also Davis, The Liberalized Law of Standing, 37 U.Chi.L.Rev. 450 (1970).

Turning to the facts of this case to determine whether plaintiff-appellee has standing, the Sierra Club in its complaint alleges that it is a non-profit corporation under the laws of the State of California. It claims a membership of approximately 78,000 nationally, with approximately 27,000 members residing in the San Francisco Bay Area. It asserts that it has for many years taken a special interest in the conservation and sound maintenance of the national parks and forests and particularly lands on the slopes of the Sierra Nevada mountains. It states that "its interests would be vitally affected by the acts hereinafter described and would be aggrieved by those acts of the defendants as hereinafter more fully appears."

Up to this point there is no adversary position stated between the Sierra Club and the Secretary of Agriculture or the Secretary of the Interior. Not only do the latter have a special "interest" in the national parks and forests but they are charged by Congress pursuant to a constitutional mandate with the direct responsibility for the protection and conservation of the national parks and forests.

The club's complaint continues by outlining the recreational development proposal which constitutes the substance of its grievance. It concludes by particularizing the acts of the Secretaries which it asserts are in excess of statutory jurisdiction, are arbitrary and capricious and constitute an abuse of discretion. The proposed development and the permits to authorize it are alleged to be: (1) in violation of the statute limiting the size, terms and manner of occupation of lands for resorts and associated facilities; (2) in violation of the permit power of the Secretary of Agriculture; (3) beyond the jurisdiction of the defendants as to the National Game Refuge. In a second claim for relief the complaint asserts that a proposed highway will be built which will cross 9.2 miles of Sequoia National Park and that the authorization of this roadway is in excess of authority. In its brief the appellee complains of the proposed construction of a transmission line within the park al-

though this is not asserted in the complaint. The complainant does not assert that any of its property will be damaged, that its organization or members will be endangered or that its status will be threatened. Certainly it has an "interest" in the sense that the proposed course of action indicated by the Secretaries does not please its officers and board of directors and through them all or a substantial number of its members. It would prefer some other type of action or none at all. On the other hand, the United States Ski Association, the Far West Ski Association, claiming 109,000 supporters, and the County of Tulare in which the development will be located, favor the action.

We do not believe such club concern without a showing of more direct interest can constitute standing in the legal sense sufficient to challenge the exercise of responsibilities on behalf of all of the citizens by two cabinet level officials of the government acting under Congressional and Constitutional authority.

The district court relied on four cases to support its position that the Sierra Club had standing. They are Scenic Hudson Preservation Conference v. F.P. C., 354 F.2d 608 (2d Cir. 1965), cert. denied, Consolidated Edison Co. of New York, Inc. v. Scenic Hudson Preservation Conference, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966); Office of Communication of United Church of Christ v. F.C.C., 123 U.S.App.D.C. 328, 359 F.2d 994 (1966); Powelton Civic Home Owners Association v. Department of Housing And Urban Development, 284 F.Supp. 809, 825–828 (E.D.Pa.1968); Road Review League v. Boyd, 270 F.Supp. 650, 661 (S.D.N.Y.1967).

The *Scenic Hudson* case involved a petition to set aside a license to Consolidated Edison of New York to construct a pumped storage hydro-electric project on the west side of the Hudson River at Storm King Mountain. The petitioners were

three towns and the Scenic Hudson Preservation Conference—an association of conservationist organizations. The license was issued by the Federal Power Commission after hearings under the provisions of the Federal Power Act in which petitioners participated as parties. Section 313(b) of the Act specifically grants to a party aggrieved by an order of the commission the right of review by the United States courts of appeals. There is no such statute involved in the present case to give standing.

In addition, the Second Circuit pointed out that several of the petitioners had sufficient actual economic interest to support their standing to obtain review. 354 F.2d at 616–617. No such showing has been made in the present case.

The *United Church of Christ* case, *supra*, was one of a number of consumer cases. There the F.C.C. had denied to petitioners the right to intervene and, as listeners to the programming of a radio and television station, to present their views in a proceeding to renew the license of that station. In that case as in other consumer cases, the court pointed out that the listeners were the persons "affected" or "aggrieved." They had standing in the same sense that coal consumers were found to have standing to review a minimum price order [3] or that a transit rider had standing to appeal a fare increase.[4]

*Road Review League, supra,* was a complaint to review and set aside an order of the Federal Highway Administrator establishing the alignment of an interstate highway. The plaintiffs were persons and organizations who would be directly affected by the proposed road including persons whose property would be taken. This identification of the plaintiffs is itself a statement of the distinction between that case and the one under consideration. Powelton Civic Home Owners Association v. Department of Housing And Urban Development,

---

3. Associated Industries v. Ickes, 134 F.2d 694 (2d Cir. 1943).

4. Bebchick v. Public Utilities Commission, 109 U.S.App.D.C. 298, 287 F.2d 337 (1961).

*supra,* is the final case relied upon by the trial court. We consider it inapposite. It involved the location of an urban development project. The plaintiffs were persons whose homes and properties would be taken to implement the project. The court stated:

"However, we are of the opinion that the plaintiffs also have standing in the more traditional sense: they have substantive legal rights conferred by the National Housing Act. They have private individual legal rights; and they are the appropriate representatives of legal rights conferred by the Housing Act on the general public." 284 F.Supp. at 821.

The *Powelton* case would be in point if the homes of residents at Mineral King were to be razed and those homeowners objected. There is no such showing.

On this appeal appellee does not limit itself to the four cases cited by the district court in support of its standing to sue. It calls attention to the recent cases decided by the Supreme Court and by the lower courts. We have examined each of these cases and others not cited, but fail to be convinced that any of them go so far as to support the standing claim here. We are not unmindful of the Supreme Court's recent opinion in Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), which was an action by plaintiffs, who sold data processing services to business generally, against the Comptroller of the Currency who had ruled that national banks could make their data processing services available to other banks and to bank customers. It was thus a competitor's suit and so designated by the Court. The first question to be asked by the Court was whether the Comptroller's action had caused injury in fact to the petitioners. The answer was that there was no doubt but that such injury existed or would develop in the future because the competition

would entail loss of profits. Here, therefore, there was direct injury in fact, and therefore there was standing. The Court went beyond these facts in its discussion of standing generally and the effect of the Administrative Procedure Act in particular. It said that aside from the case or controversy test, standing is concerned with the question:

"Whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." 397 U.S. at 153, 90 S.Ct. at 830.

The significance of the language is not entirely clear. It is likewise not made clear in a companion case decided the same day and involving the same question.[5] We submit that it does not establish a test separate and apart from or in addition to the test which the Court first looked to in *Camp:*

"The first question is whether the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise. There can be no doubt but that petitioners have satisfied this test. The petitioners not only allege that competition by national banks in the business of providing data processing services might entail some future loss of profits for the petioners, they also allege that respondent American National Bank & Trust Company was performing or preparing to perform such services for two customers for whom petitioner Data Systems, Inc., had previously agreed or negotiated to perform such services." 397 U.S. at 152, 90 S.Ct. at 829.

This is the test which will reconcile most if not all of the decided cases and also fit the standard of the Administrative Procedure Act. "Standing to sue", as the phrase indicates, refers to the posture of the plaintiff and not to the "legal interests" to be unravelled. The Court said in Jenkins v. McKeithen, 395 U.S. 411,

---

5. Barlow v. Collins, 397 U.S. 159, 96 S.Ct. 832, 25 L.Ed.2d 192 (1970). See discussion of both cases in Davis, *supra.*

423, 89 S.Ct. 1843, 1850, 23 L.Ed.2d 404 (1969):

> "In this sense, the concept of standing focuses on the party seeking relief, rather than on the precise nature of the relief sought. See Flast v. Cohen, *supra*, 392 U.S. at 99–100, 88 S.Ct. at 1952. The decisions of this Court have also made it clear that something more than an 'adversary interest' is necessary to confer standing. There must in addition be some connection between the official action challenged and some legally protected interest of the party challenging that action. See Flast v. Cohen, *supra*, [392 U.S.] at 101–106, 88 S.Ct. 1953–1955."

Nor does the Administrative Procedure Act, 5 U.S.C. §§ 701–706, and particularly Section 702, aid the appellee here.[6] Judge Burger, now Mr. Chief Justice Burger, in a concurring opinion in National Association of Securities Dealers, Inc. v. SEC, 136 U.S.App.D.C. 241, 420 F.2d 83, 101 (1969), cert. granted, 397 U.S. 986, 90 S.Ct. 1114, 25 L.Ed.2d 394 (1970), commented that the above section broadened the basis of standing, as follows:

> "Appellees also assert that § 702(a) (Supp. II, 1967), embodies an independent and self-sufficient statutory basis for standing. I do not feel that the APA was meant to arrest the development of the law of standing as of the date of its passage:
>
> '[W]e would certainly be prepared to hold in an appropriate case that one who complains of administrative action may find a remedy under the Act beyond the strict scope of judicial review recognized prior to its adoption * * *.'

"Kansas City Power & Light Co. v. McKay, 96 U.S.App.D.C. 273, 282, 225 F.2d 924, 933, cert. denied, 350 U.S. 884, 76 S.Ct. 137, 100 L.Ed. 780 (1955). *Nevertheless, although the review provisions of the APA were not meant to retard the judicial development and adaptation of the law of standing, it does not establish an independent right to review absent judicially articulated notions of 'legal wrong' of 'adversely affected or aggrieved * * * within the meaning of any relevant statute.'* See Pennsylvania R.R. Co. v. Dillon, *supra* note 2 [118 U.S.App.D.C. 257, 335 F.2d 292]." 420 F.2d at 104 n.5. (Emphasis supplied).

In almost every carefully-considered case where standing is sustained it is apparent in the facts or in the opinion that when the situation of the plaintiff is examined there is an element of legal wrong being inflicted upon him or he is adversely affected by agency action or aggrieved within the meaning of a relevant statute.[7] That adverse effect, of course, need not be economic but, as the Supreme Court has recently observed, may be aesthetic, conservational or recreational. *Data Processing, supra*, 397 U.S. at 154, 90 S.Ct. 827. It is this element which appellee fails to sufficiently allege in its complaint and support by its exhibits attached. It does not allege that it is "aggrieved" or that it is "adversely affected" within the meaning of the rules of standing.[8] Nor does the fact that no one else appears on the scene who is in fact aggrieved and is willing or desirous of taking up the cudgels create a right in appellee. The right to sue does not inure to one who does not possess it, simply because there is no one else willing and able to assert it.

6. "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

7. Davis, *supra* at 466. See also South Hill Neighborhood Ass'n v. Romney, 421 F.2d 454 (6th Cir. 1969), cert. denied, 397 U.S. 1025, 90 S.Ct. 1261, 25 L.Ed.2d 534 (1970).

8. "Aggrieved" is defined as "Having suffered loss or injury; damnified; injured." Black's Law Dictionary (4th ed. 1968).

We do not believe that the Sierra Club's complaint alleges that it or its members possess a sufficient interest for standing to be conferred. There is no allegation in the complaint that members of the Sierra Club would be affected by the actions of defendants-appellants other than the fact that the actions are personally displeasing or distasteful to them.

In holding that the complaint fails to allege that the Club has the requisite standing to institute this action, we are aware that federal courts have accorded the Club standing to object to alleged administrative infringement upon natural resources in two recent cases: Citizens Committee for Hudson Valley v. Volpe, 425 F.2d 97 (2d Cir. 1970), and Parker v. United States, 307 F.Supp. 685 (D.Colo.1969). In both of these cases, however, the Sierra Club was joined by local conservationist organizations made up of local residents and users of the area affected by the administrative action. No such persons or organizations with a direct and obvious interest have joined as plaintiffs in this action.[9] The question of standing here must be decided from the facts in this action. We hold that they do not establish the interest necessary for that purpose.

### (2) The merits

Apart from questions of standing, an order granting a preliminary injunction must be based upon established equitable grounds. "The grant of a preliminary injunction is the exercise of a very far reaching power never to be indulged except in a case clearly warranting it." Dymo Industries, Inc. v. Tapeprinter, Inc., 326 F.2d 141, 143 (9th Cir. 1964). In order to obtain such relief, particularly against the discretionary ac-

tion of an official of cabinet rank, the plaintiff must establish a strong likelihood or "reasonable certainty" that he will prevail on the merits at a final hearing. Garlock, Inc. v. United Seal, Inc., 404 F.2d 256, 257 (6th Cir. 1968); H. E. Fletcher Co. v. Rock of Ages Corp., 326 F.2d 13, 17 (2d Cir. 1963).

> "It is a cardinal principle of equity jurisprudence that a preliminary injunction shall not issue in a doubtful case. Unless the court be convinced with reasonable certainty that the complainant must succeed at final hearing the writ should be denied." Hall Signal Co. v. General Ry. Signal Co., 153 F. 907, 908 (2d Cir. 1907).

In addition, before such a writ should issue, the applicant must show that it will suffer irreparable injury. The court must balance the damage to both parties. Dorfmann v. Boozer, 134 U.S.App.D.C. 272, 414 F.2d 1168, 1173 (1969). The injunction must rest upon a convincing presentation and, because of this, an appellate court may reverse an order granting a preliminary injunction where the appellee's showing is something less than the persuasive demonstration upon which an injunction must be predicated. District 50, United Mine Workers of America v. International Union, UMW, 134 U.S.App.D.C. 34, 412 F.2d 165, 167 (1969); Udall v. D.C. Transit System, Inc., 131 U.S.App. D.C. 381, 404 F.2d 1358, 1360–1361 (1968). As will appear, the appellee herein has shown neither a reasonable certainty that it will prevail nor irreparable injury.

We recognize that in appraising these issues, even upon a preliminary basis, our function is not to make an original judgment or to make a final deci-

---

9. To the extent to which Citizens Committee for Hudson Valley v. Volpe, indicates that the Sierra Club has standing within the "private Attorney Generals" rule, we respectfully disagree. We believe that rule is limited as it states to cases where Congress has enacted a statute "conferring on any non-official person, or on a group of non-official per-

sons, authority to bring a suit" to prevent unauthorized official action. See, Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d at 864. We find no indication in any federal statute that Congress has "conferred" on the Sierra Club or any group like it, authority to bring suits to challenge official action.

sion on the merits. See, e.g., Public Service Commission of Wisconsin v. Wisconsin Telephone Co., 289 U.S. 67, 70, 53 S.Ct. 514, 77 L.Ed. 1036 (1933); Industrial Bank of Washington v. Tobriner, 405 F.2d 1321, 1324 (D.C.Cir. 1968). The district court has done this. The function of this court on appeal is to determine whether in that original preliminary injunction there has been an abuse of sound discretion of the district court. Washington Capitols Basketball Club, Inc. v. Barry, 419 F.2d 472, 475 (9th Cir. 1969); Ross Whitney Corp. v. Smith Kline & French Laboratories, 207 F.2d 190, 194 (9th Cir. 1953).

■ The district court has first considered the development in the light of the permits which are to be issued by the Secretary of Agriculture and has concluded that it "may involve a violation not only of the letter, but also the purpose and intent" of the applicable law. The court directed its attention particularly to the use by the Secretary of his authority to issue permits to accomplish the objectives sought. Examining the same documentation in the light of the established practices of the Secretary, we respectfully come to a different conclusion.

The proposal of Disney and the action taken by the Secretary is to permit a land use of forest lands by the issuance of two types of permits. The first type is a term permit for an aggregate of eighty acres with a maximum term of thirty

years. The second is called a "revocable permit", meaning the Secretary imposes no limitation on time or acreage.

The district court has concluded that Congress has never expressly authorized revocable permits and that the only authority to issue them is under the general power to regulate the forests and under a 1928 Attorney General's opinion. Upon such a tenuous base, the broad application which is proposed here becomes questionable to the lower court. We find the Secretary's authority rests upon much firmer ground.

Originally the management of the lands reserved for national forests was under the supervision of the Secretary of the Interior. In 1905 these powers were transferred to the Secretary of Agriculture,[10] and he was given authority to make rules and regulations to preserve the forests from destruction.[11] As early as May 31, 1905, the Secretary of Agriculture was advised by the Attorney General that he had the authority to issue revocable permits.[12]

This permit authority under the Secretary's general regulatory power was upheld by the Supreme Court in United States v. Grimaud, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563 (1911). At the time of the amendment of 16 U.S.C. § 497 in 1956 to authorize the issuance of term permits for eighty acres for thirty years, the House Report commented on the practice of the Secretary to issue revocable

---

10. Act of Feb. 1, 1905, Ch. 288, 33 Stat. 628.

11. Act of June 4, 1897, Ch. ——, 30 Stat. 35.

12. An application for a permit to occupy forest lands for use in conducting a fish salter, oil and fertilizer plant was made to the Secretary. He requested an opinion from the Attorney General as to his authority. Replied the Attorney General:

"It would therefore seem that when, in the exercise of that discretion, you determine that the granting of a permit to use and occupy a reservation for a specified purpose is consistent, according to your judgment, with insuring the objects for which the reservation was

created, then your decision in the premises is definitive and subject to review in no other way than by the Congress from which your power to act was derived. Answering your first question therefore, I have to advise you that, in my opinion, you possess authority to grant a permit for such a purpose as that set forth in the application referred to by you."

In the same opinion, with respect to an inquiry as to the time for which such a permit might be issued, the Attorney General responded " * * * the permits should not be given for a longer period than, under the circumstances of each case would seem reasonable." 25 Op. Att'y Gen. 470, 472 (1905).

permits under his general regulatory powers, saying:

"The Department of Agriculture now has adequate authority to issue revocable permits for all purposes under the act of June 4, 1897 (16 U.S.C. 551)." House Report No. 2792, U.S. Code Cong. § Ad.News, 3635 (1956).[13]

The court below has understandably relied upon the authority of the opinion of the Attorney General to the Secretary of War, 35 Op.Att'y.Gen. 485 (1928). That opinion is the basis for the court's discussion of the necessity that a revocable permit be terminable "at will" and that therefore *this* permit is not properly issued. We have found no such limitation apart from this Attorney General's opinion. The same erroneous premise results in the district court's concern about the removability of any improvements placed upon the land covered by the revocable permit. It is at the bottom of the district court's conclusion that a combination of a term permit and a revocable permit may be an impermissible and unlawful exercise of administrative authority. Beginning from a correct premise that the revocable permit is an approved device for forest management under Congressional mandate from the Attorney General, the Supreme Court and the Congress, we believe an entirely different conclusion would have been reached. The fact that the record discloses that there are now a total of at least eighty-four recreational developments on national forest lands in which there is such a combination of the term permit and the revocable permit is convincing proof of their legality.[14] Many of these developments are ski developments making use of the maximum acres of the term permit plus revocable permits for additional acreage in amounts in some cases in excess of 6,000 acres. See the United States Forest Service tabulation in Appendix, Brief of Amicus Curiae Ski Association. It seems apparent, as was obvious to both Senate and House Committees, that the eighty-acre long-term permit was a necessity to obtain proper financing for substantial permanent improvements, while developments of less magnitude and permanency, such as trails, slopes, corrals, could be placed upon lands held under revocable permits.[15] We find no indication in those reports that ski lifts are limited to the term permits. The planned development in the instant case discloses that most major improvements are to be located upon lands held under the eighty-acre term permits while lifts and trails will be

13. The district court has cited and relies upon an opinion of the Attorney General in 1928 as one which "narrowly" restricts the implied power of the Secretary of Agriculture to issue revocable permits. 35 Op. Att'y Gen. 485 (1928). This opinion for some inexplicable reason was cited to the district court by the defendants. It had nothing to do with the authority of the Secretary of Agriculture under the statute granting him power over the forests. It was an opinion addressed to the Secretary of War in answer to an inquiry as to whether the Secretary of War had the authority to grant to the Southern Pacific Railroad Co. a permit to construct a railroad line across a portion of a California military reservation. The Attorney General pointed out that the Secretary of War had no power to grant any permanent estate for railroad purposes and no express statutory authority to grant revocable licenses or permits.

The opinion also pointed out a long administrative practice in granting some revocable permits and then in the guarded language quoted by the trial court below, opined that in very limited circumstances such a revocable permit might be granted. Counsel for the Secretary of Agriculture apparently cited this opinion for lack of one directly in point. It need not have done so. As the district court pointed out, the opinion adds nothing to the Secretary's case.

14. Affidavit of W. S. Davis, Assistant Regional Forester, California Region, Record 238. See Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), which holds that great deference must be given to interpretations of statutes of officers or agencies charged with their administration.

15. See Senate Report No. 2511, Record p. 298; House Report No. 2792, Record p. 293.

installed "throughout about 13,000 acres." [16] Evidence of great concern for the ecology of the area and the preservation and conservation of natural beauty and environmental features appears throughout the planning reports attached as exhibit. We find little or no likelihood of success in opposing the proposed development upon the ground that there would be an illegal use of term and revocable permits.

### A. *Permit for Highway*

 The district court next discusses the proposal of the Secretary of Interior to issue a permit to the State of California to construct a segment of roadway through the national park. The road proposed is one from an existing state highway (Cal. 198) to Mineral King. No cases have been cited to illustrate the alleged impropriety of this permit to cross 9.2 miles of national park lands in the twenty mile route from Three Rivers to Mineral King. We know of none. In fact, there is an existing road from Three Rivers to Mineral King which traverses the same park. That road is a narrow substandard roadway with sharp switchbacks rising from an elevation of 1,160 feet at its junction with Route 198 to an elevation of 7,830 feet at Mineral King. Most of it has oiled surface with a portion graded only. It does not qualify for state maintenance (Record 101). The proposed road follows the alignment of the old road to some extent and substantially parallels it in others. The record shows a great deal of concern in its planning for preservation of aesthetic and ecological values. The defendant Superintendent of the National Park concerned has stated under oath that the construction will be engineered.

"* * * so that there will be a minimum impact on the national park values. The alignment of the road will be carefully selected to protect the Sequoia trees, natural areas, existing drainage ways, and the over-all ecolo-

gy of the area." (Record 251; see also as to Sequoia trees and wild-life, Record p. 103–104.

No question is raised as to the wide discretion given to the Secretary of the Interior in managing national parks to construct and improve roads and trails therein. See 16 U.S.C. § 8. We know of no law and find little logic in a contention that a twisting, substandard, inadequate road through 9.2 miles of the park is legal but that an improved all weather two lane highway along a new but approximately parallel alignment is illegal. No authorities have been cited in support of such a position. We cannot find in the appellee's contentions concerning this proposed road any degree of substantiality.

### B. *Permit for Transmission Line*

 Although not alleged in the complaint, appellee has questioned in its brief and the district court has alluded to the proposal of the Secretary of the Interior to grant permission for a right of way for a power line to provide electrical power for uses in connection with the project. Again, with deference, we fail to find this a substantial issue upon which to base the grant of a preliminary injunction. It seems unlikely that the appellee could prevail as to such a contention. Under 16 U.S.C. § 5 authority is clearly provided to the Department of the Interior in its management of parks to grant permits and easements for rights of way for "electrical poles and lines for the transmission and distribution of electrical power." It is suggested, however, that under 16 U.S.C. § 45(c) such a permit may not be issued without an act of Congress. This latter section does apply specifically to Sequoia National Park. It recognizes in the first portion of the section, existing valid claims for homesteads, mineral rights or rights for any other purposes whatsoever; it then gives to the Secretary authority to issue

---

16. The gross acreage of Sequoia National Forest is 1,178,767 acres, which does not

include areas within Sequoia National Park or King's Canyon National Park.

permits for timber cutting and grazing and concludes with a proviso that:

"* * * no permit, license, lease, or authorization for dams, conduits, reservoirs, power houses, transmission lines, or other works for storage or carriage of water, or for the development, transmission, or utilization of power within the limits of said park as constituted by said sections, shall be granted or made without specific authority of Congress."

The Secretary contends that this section was intended to apply only to the construction and development of hydroelectric projects and related facilities including power lines. In the context of 16 U.S.C. § 5 and the unlikely intention to require an act of Congress for each electrical line within the park we accept the argument of the Secretary as convincing.

### C. *Public Hearings*

Finally, the trial court pointed to the contention of the appellee that no public hearings were ever held with respect to the highway. The existence of any such requirement upon the Secretary of Interior or the Secretary of Agriculture is unclear. It does appear, however, that there was a hearing on this project in 1953. It also appears that there was a public hearing on August 10, 1967. (Record 96; 111; 230). The hearing was held by the California Division of Highways which would have been the permittee and was working closely with Agriculture and Interior. It is described in Exhibit F as having been a "well-publicized" public hearing attended by approximately 210 persons including California Assemblymen or their representatives, members of the Boards of Supervisors of Kern County and Tulare County, the Superintendent of Sequoia National Park, the Supervisor of Sequoia National Forest, representatives of fish and game, forest service, Federal Water Pollution Control Administration and civic and public organizations. The Sierra Club was present. It does not appear that the proposed roadway was any clandestine project. As a matter of fact, it does not appear that a permit was issued until more than a year later and then subject to agreement upon design standards. The matter of public hearings cannot be considered a substantial factor in this proceeding.

### D. *The National Game Refuge*

A portion of the land within the area under consideration has been designated as a National Game Refuge. It has been suggested that this project would somehow interfere with the refuge and be in excess of authority. The act establishing the refuge declares that:

"The hunting, trapping, killing, or capturing of birds and game or other wild animals upon the lands of the United States within the limits of said area shall be unlawful,"

except under regulations of the Secretary of Agriculture.[17] We find no substance in this argument.

The appellee has not shown with any degree of certainty that it will or can succeed. Neither has it shown that it, or its members or anyone else will suffer irreparable injury. This is not a case "clearly warranting" the grant of a preliminary injunction. Dymo Industries, Inc. v. Tapeprinter, Inc., *supra,* 326 F.2d at 143. The nation's natural resources are not the property of any particular group. One of the basic social ills of today is that we have too many people living too close together. It appears that the friction thus created is becoming increasingly abrasive. The satisfaction of the basic necessities of such a population creates environmental problems which are not within the expertise of this court. We cannot say, however, that the Secretary of Agriculture and the Secretary of the Interior have made an arbi-

17. 16 U.S.C. § 688.

**38**

trary and capricious judgment in determining to make available a vast area of incomparable beauty to more people rather than to have it remain inaccessible except to a rugged few.

The order granting the preliminary injunction is vacated and the cause is remanded for further proceedings in conformity herewith.

HAMLEY, Circuit Judge (concurring):

In my view Sierra Club has standing to prosecute this lawsuit. It seems to me that the rationale of recent Supreme Court pronouncements in this area, if not the precise holdings, call for such a determination. In Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 154, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), as the majority itself notes, the Supreme Court made it clear that the element of legal wrong need not be economic in nature, but may be aesthetic, conservational or recreational.

The Sierra Club represents thousands of members who have a deep interest in aesthetic, conservational and recreational values of a kind intended to be safeguarded by the statutes in question, and the *regulations and practices thereunder.* If these statutes are being disregarded, or the regulations and practices thereunder are invalid, and the result is that the described values are being undermined or disregarded, it seems to me the Sierra Club members *may assert that a legal wrong is being inflicted upon them*—a wrong which their chosen organization has standing to resist in this lawsuit.

However, for the reasons stated in the last section of the majority opinion, under the heading "The merits," I am convinced that the granting of the preliminary injunction amounted to an abuse of discretion and therefore must be reversed. The trial court acted with painstaking care which is deserving of high commendation, but, in my view, there is an inadequate legal foundation for the order entered.