**COUNTY OF ALAMEDA et al., Plaintiffs-Appellees,**

v.

**Caspar W. WEINBERGER, etc., et al., Defendants-Appellants.**

No. 75–1602.

United States Court of Appeals, Ninth Circuit.

June 19, 1975.

**346**

Michael Stein (argued), Appellate Section, Civ. Div., Dept. of Justice, Washington, D. C., for defendants-appellants.

John J. Klee (argued), Deputy Atty. Gen., San Francisco, Cal., Lorenzo E. Chambliss (argued), Deputy County Counsel, County of Alameda, Cal., for plaintiffs-appellees.

OPINION

Before KOELSCH, BROWNING, and HUFSTEDLER, Circuit Judges.

HUFSTEDLER, Circuit Judge:

The United States Department of Health, Education, and Welfare ["HEW"], claiming that it had overpaid the State of California $11,020,249 in grants under the Social Security Act, deducted a portion of the asserted overpayments from its current quarterly grants to the State.[1] Several counties and the State sued to prevent further deductions and to secure release of monies withheld. The district court granted a preliminary injunction. HEW and the other federal defendants appealed and sought a stay pending determination of the appeal. We expedited the appeal. We affirm the issuance of the preliminary injunction and dismiss as moot the application for a (continued) stay.

In December 1968, the State of California submitted to HEW for its approval a welfare plan involving aid to the aged, the blind, and the disabled, to be effective retroactively to July 1, 1968. The plan included the "formula" that federal financial participation would be 75 percent for "mixed caseload" and "general administrative and overhead" costs.[2] On March 19, 1969, the State advised its county welfare agencies that HEW's approval of the plan (including the 75 percent formula) was pending and that if the plan was "not finally approved, retroactive adjustments could be required." On April 21, 1969, HEW, through its Acting Regional Commissioner, indicated that the plan, and specifically the 75 percent formula, had "been accepted for incorporation into the State's approved plan, comments in letter."[3] Thereafter HEW paid all of California's claims under the plan for the nine quarters from July 1, 1968, to September 1, 1970.[4]

1. The asserted overpayments were made in grants under Titles I, X, and XIV of the Social Security Act; the deduction was made under Title VI (see especially 42 U.S.C. § 803(b), infra note 13), which superseded Titles I, X, and XIV.

2. "Mixed caseload" costs: "The salary, employee benefits and travel incurred for caseworkers, supervisors, directly supporting clerical workers and other personnel concurrently assigned cases which involve either or both social services and income maintenance effort." (HEW, Handbook of Public Assistance Administration, Part V.)

"General administrative and overhead" costs: "The salary and related costs of welfare directors, fiscal workers and other administra- tive positions together with overall supporting costs such as office space, utilities, building maintenance, equipment and communication." (Id.)

3. The "letter" referred to is from Ms. Lucy Ellison, Acting Regional Commissioner of HEW, to Mr. John Montgomery, Director of the Department of Social Welfare of the State of California, dated April 21, 1971. While the precise import of this letter is not entirely clear to this court, the letter does not appear to modify in any way the basic indication that the provision in question "[h]as been accepted for incorporation into the State's approved plan."

4. Significantly, HEW paid California's claims under the plan even for the period—July 1,

The General Accounting Office ["GAO"] began an audit of HEW in the latter half of 1970; sometime later GAO advised HEW that HEW's California claim payment practices were contrary to applicable regulations. On October 28, 1970, HEW informed California officials that the formula was not approved and, in effect, withdrew its approval of April 21, 1969. On October 29, 1971, an audit indicated HEW "overpayments" to California, during the period from July 1, 1968, to September 1, 1970, in the amount of $11,020,249: $7,163,451 for mixed caseload costs and $3,856,798 for general administrative and overhead costs. Those figures were based on the assumption (which plaintiffs dispute) that the two costs were claimable at 50 percent, not 75 percent, under applicable HEW guidelines. HEW unilaterally decided to recoup the overpayment from its current quarterly grants. The first of four anticipated quarterly deductions was made, and this suit followed.[5]

Appellants contend that the district court did not have jurisdiction of the subject matter and that, if it had jurisdiction, it abused its discretion in granting the preliminary injunction.

## I.

The parties treat HEW's October 29, 1971 disapproval as a "disallowance" within the meaning of 42 U.S.C. § 1316(d), which provides in relevant part:

> Whenever the Secretary determines that any item or class of items on account of which Federal financial participation is claimed . . . shall be disallowed for such participation, the State shall be entitled to and upon request shall receive a reconsideration of the disallowance.

■■■ Relying on implications it draws from the entire text of 42 U.S.C. § 1316 and from portions of the legislative history of the statute, HEW argues that Congress foreclosed judicial review of disallowance determinations, thereby removing them from the purview of the Administrative Procedure Act (5 U.S.C. § 701(a)(1).)[6] HEW points out that subsection (a)(3) of § 1316[7] expressly permits review by direct appeal from the agency to the courts of appeals in "conformity" cases, and the statute is otherwise silent on judicial review. It invokes the maxim *expressio unius est exclusio*

---

1968, to April 21, 1971—during which the plan had not yet been approved.

**5.** Plaintiffs do not dispute HEW's authority to pay the claims involved here at a rate other than 75 percent for the period *after* October 29, 1971.

**6.** The "committed to agency discretion" exception (5 U.S.C. § 701(a)(2)) is not even plausibly applicable here. "The legislative history of the Administrative Procedure Act indicates that [that exception] is applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.' " (*Citizens to Preserve Overton Park, Inc. v. Volpe* (1971) 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136; *see id.* at 410–13, 91 S.Ct. 814.)

**7.** Section 1316(a), providing for administrative and judicial review of public assistance determinations, reads in relevant part as follows:

(1) Whenever a State plan is submitted to the Secretary by a State for approval under subchapter I, VI, X, XIV, XVI, or XIX of this chapter, or part A of subchapter IV of this chapter, he shall, not later than 90 days aft-

er the date the plan is submitted to him, make a determination as to whether it conforms to the requirements for approval under such subchapter. The 90-day period provided herein may be extended by written agreement of the Secretary and the affected State.

\* \* \*

(3) Any State which is dissatisfied with a final determination made by the Secretary on such a reconsideration or a final determination of the Secretary under section, 304, 604, 804, 1204, 1354, 1384, or 1396c of this title may, within 60 days after it has been notified of such determination, file with the United States court of appeals for the circuit in which such State is located a petition for review of such determination. A copy of the petition shall be forthwith transmitted by the clerk of the court to the Secretary. The Secretary thereupon shall file in the court the record of the proceedings on which he based his determination as provided in section 2112 of Title 28.

\* \* \*

*alterius* in support of its inference that judicial review is precluded in all instances other than conformity cases. Reference to routine construction aids does not assist HEW because the controlling principle is that judicial review of final agency action shall not be deemed foreclosed unless Congress has forbidden review in unmistakable terms. The jurisdictional "question [should be] phrased in terms of 'prohibition' rather than 'authorization' because . . . judicial review of final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." (*Abbott Laboratories v. Gardner* (1967) 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681.) HEW has the burden of establishing by " 'clear and convincing evidence' " that Congress, in enacting section 1316, "clearly command[ed]" that review be prohibited. (*Barlow v. Collins* (1970) 397 U.S. 159, 167, 90 S.Ct. 832, 25 L.Ed.2d 192.)

The legislative history argument fares no better because it too begins and ends with ambiguity. HEW contends that section 1316 (a part of the Social Security Amendments of 1965) was a response to federal court decisions holding that challenges to HEW approval or disapproval of state welfare plans were barred by the doctrine of sovereign immunity.[8] HEW concludes that in subsection 1316(a)(3) Congress consented to suit only in respect to conformity decisions, not disallowances. At most, the history suggests that Congress intended that conformity decisions be reviewable, not that review of disallowances be prohibited. Conformity is a more fundamental issue than disallowance; to permit review of the former, but not the latter, would be anomalous from the standpoint of any sovereign-immunity concern.

HEW emphasizes that Senator Jacob Javits, in introducing a bill which was eventually incorporated into 1316(a), included in his remarks a reference to a May 1964 report on public assistance by the Advisory Commission on Intergovernmental Relations. The final paragraph of the report states:

> Some states and local officials believe that some form of judicial review should encompass all aspects of the public assistance programs, including matching issues or audit exceptions. However, the much greater concern is for review of decisions regarding plan conformity issues. The Commission believes that to involve audit exceptions or issues other than those of plan conformity in the judicial review process would create many additional problems.
>
> [111 Cong.Rec. 3068 (1965).]

This is only one paragraph in the Commission's report. The import of Senior Javits' mention of the whole report sheds little light on Senator Javits' "intention" regarding district court review of disallowances; it sheds no light at all on any congressional intent regarding such review.[9]

■ HEW argues finally that considerations of public policy militate against

---

8. *See, e. g., Arizona v. Hobby* (1954) 94 U.S. App.D.C. 170, 221 F.2d 498.

9. One court has concluded that Congress authorized judicial review in 42 U.S.C. § 1316(a) in order to strengthen federalism. (*National Welfare Rights Organization v. Finch* (1970) 139 U.S.App.D.C. 46, 57, 429 F.2d 725, 736.) In reaching this conclusion, the D.C. Circuit relied on a portion of the Advisory Commission's May 1964 report not cited by defendants in this case:

> [Procedures for judicial review] would place the States on an equal basis with the Federal

Government in the administration of the public assistance programs, [for as] the situation now stands, the Federal agency definitely has the upper hand in the Federal-State partnership because there is no recourse for the State beyond the decision of the Secretary. [111 Cong.Rec. 3067 (1965).]

Certainly judicial review of disallowance decisions serves to "place the States on an equal basis with the Federal Government in the administration of public assistance programs" and is therefore consistent with a congressional intent to strengthen federalism.

judicial review of disallowances, and that we should presume a congressional intent that accords with public policy. HEW warns us that § 1316(d) disallowance questions involve complex accounting matters necessitating the exercise of broad discretion by the Secretary. We are unconvinced that any public policy exists to shield the courts from complex issues or to confer upon the Secretary of HEW broad discretion more heavily insulated from judicial scrutiny than that committed to other lofty administrative heads. (*Cf. Citizens to Preserve Overton Park, Inc. v. Volpe* (1971), 401 U.S. 402, 410–13, 91 S.Ct. 814, 28 L.Ed.2d 136.) To the contrary, Congress has expressly conferred jurisdiction in conformity cases which involve issues at least as complex as those in disallowance matters and discretion at least as broad exercised by the same Secretary.

■ HEW has not carried its burden.[10] Therefore, we hold that a final determination of disallowance under the narrow facts of this case is subject to judicial review under the applicable provisions of the Administrative Procedure Act. (*Cf. National Welfare Rights Organization v. Finch* (1970) 139 U.S.App.D.C. 46, 56–59, 429 F.2d 725, 735–38; *cf. also Kingsbrook Jewish Medical Center v. Richardson* (2d Cir. 1973) 486 F.2d 663, 666–68; *Aquavella v. Richardson* (2d Cir. 1971) 437 F.2d 397, 400–03.)[11]

## II.

■ In reviewing the district court's issuance of a preliminary injunction, we "may only consider whether issuance of the injunction constituted an abuse of discretion." (*Brown v. Chote* (1973) 411 U.S. 452, 457, 93 S.Ct. 1732, 1735, 36 L.Ed.2d 420; *see also P. v. Riles* (9th Cir. 1974) 502 F.2d 963; *Sierra Club v. Hickel* (9th Cir. 1970) 433 F.2d 24, 33–34.) In issuing preliminary injunctive relief, the district court must decide whether (1) plaintiffs will likely prevail on the merits; (2) plaintiffs, in the absence of preliminary relief, may suffer irreparable harm; and (3) the foreseeable hardship to defendants from a preliminary injunction is less severe than the harm plaintiffs will suffer absent preliminary relief. (*E. g., P. v. Riles, supra Sierra Club v. Hickel supra* 433 F.2d at 33–34.) The district court resolved each of those issues in plaintiffs' favor. The existence of injury and the balancing of hardship in plaintiffs' favor are not seriously contested on appeal because defendants recognize that the record prevents successful appellate attack on the district court's resolution of those issues. The focal point of challenge is the determination of likelihood that plaintiffs will prevail on the merits. We cannot say that the district court's assessment of probabilities of success so far misses the mark as to be characterized as an abuse of discretion.[12]

---

**10.** The strength of the presumption in favor of judicial review of administrative action, and the weight of HEW's burden in this case, is amply demonstrated in the following passages:

[J]udicial review of . . . administrative action is the rule, and nonreviewability an exception which must be demonstrated. . . . "[J]udicial review of a final agency action . . . will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." A clear command of the statute will preclude review; and such a command of the statute may be inferred from its purpose. It is, however, "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent" that the courts should restrict access to judicial review (citations omitted). [*Barlow v. Collins* (1970) 397 U.S. 159, 166–67, 90 S.Ct. 832, 838, 25 L.Ed.2d 192.]

[T]he general rule, subject only to rare exceptions, [is] that the action of a government agency in the domestic sphere, as contrasted with actions in the spheres of foreign affairs or national security, is subject to judicial review for arbitrariness and abuse of discretion, even though discretion may be broad. [*Peoples v. United States Dep't of Agriculture* (1970), 138 U.S.App.D.C. 291, 297, 427 F.2d 561, 567.]

**11.** We have no occasion to, and we do not reach the question whether ordinary audit disallowances, unaccompanied by self-help setoff procedures, are subject to judicial review.

**12.** To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (i. e., the balance of hardship tips

 HEW contends that it never approved California's welfare plan, and the plaintiffs should bear the costs of eventual disapproval. It is by no means clear from the record whether HEW approved the plan and thereafter retroactively withdrew approval, or whether it provisionally approved the plan subject to later review and potential disapproval,[13] or whether statutory authority to do the latter (assuming such authority exists) would support the former action. The correct characterization of HEW's conduct and the extent to which that conduct fell within the ambit of discretion committed by Congress to the agency are sufficiently debatable to prevent our overturning the district court's decision as an abuse of discretion. In this connection, we cannot agree with

HEW that its choice of means to effectuate recoupment was clearly within its authority. Although the regulations provide for periodic audits of the operations of a state welfare program (45 C.F.R. § 201.12) and "deductions from subsequent grants made to the State agency" to compensate for "[e]xpenditures in which it is found the Federal Government may not participate" (45 C.F.R. § 201.13(a)), the purpose of such audits and deductions is *not* to implement a retroactive disapproval of a previously approved plan; rather, the purpose is to:

(1) [Encourage] prudent use of program funds, and

(2) [Provide] a reasonable degree of assurance that funds are being proper-

---

decidedly toward plaintiff), it will ordinarily be enough that plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation. [*Hamilton Watch Co. v. Benrus Watch Co.* (2d Cir. 1953) 206 F.2d 738, 740; *see also Costandi v. AAMCO Automatic Transmissions, Inc.* (9th Cir. 1972) 456 F.2d 941, 943.]

**13.** HEW's agent originally indicated approval in writing on April 21, 1969 (*see* 45 C.F.R. § 201.3(c)), and HEW thereafter paid California's claims under the plan for the nine quarters from July 1, 1968 to September 1, 1970. Pursuant to 45 C.F.R. § 201.3(e) & (f), HEW was required to approve or disapprove California's plan within 90 days after the plan's submission. The April 21, 1969 action approving the plan was two to three weeks beyond this time limit. HEW's statutory authority to pay California's claims under a plan that was not approved is doubtful. (*See* 42 U.S.C. §§ 301(a) ("The sums made available under this section shall be used for making payments to states which have submitted, and had approved by the Secretary of Health, Education and Welfare, state plans for old age assistance"); 1201 (language to same effect—state plans for aid to the blind); 1351 (language to same effect—state plans for the permanently and totally disabled); *see also* 45 C.F.R. § 201.5 ("To states with approved plans, grants are made each quarter")). Neither the applicable statutes nor regulations seem anywhere to authorize retroactive disapproval. (*See e. g.* 45 C.F.R. § 201.6; *cf.* 45 C.F.R. § 201.3(e) & (f); *Columbia Heights Nursing Home & Hospital, Inc. v. Weinberger* (M.D.La. 1974) 380 F.Supp. 1066, 1072.) The statutory

provision allowing reductions from quarterly grants to a state due to prior overpayment may have a narrower scope than HEW claims: 42 U.S.C. § 803(b)(2) apparently refers to overpayments made because of a state's overestimate of its actual expenses during a prior quarter. Section 803(b) provides that:

(1) Prior to the beginning of each quarter, the Secretary shall estimate the amount to which a State will be entitled under subsection (a) of this section for such quarter, such estimates to be based on (A) a report filed by the State containing its estimate of the total sum to be expended in such quarter in accordance with the provisions of such subsection, and stating the amount appropriated or made available by the State and its political subdivisions for such expenditures in such quarter, and if such amount is less than the State's proportionate share of the total sum of such estimated expenditures, the source or sources from which the difference is expected to be derived, and (B) such other investigation as the Secretary may find necessary.

(2) The Secretary shall then pay, in such installments as he may determine, to the State the amount so estimated, reduced or increased to the extent of any overpayment or underpayment which the Secretary determines was made under this section to such State for any prior quarter and with respect to which adjustment has not already been made under this subsection.

. . .

(4) Upon the making of any estimate by the Secretary under this subsection, any appropriations available for payments under this section shall be deemed obligated.

ly expended, and for the purposes for which appropriated and provided for under the related Act and State plan, including [14] State laws and regulations. [45 C.F.R. § 201.12(a).]

HEW emphasizes that its alleged overpayment to California conflicted with its own guidelines. It is HEW's responsibility, in deciding whether to approve a plan, to determine whether the plan meets "the requirements for approval . . . based on relevant Federal statutes and regulations." (45 C.F.R. § 201.-3(d).) To the extent that HEW's "guidelines" were in apparent conflict with HEW's approval of California's plan, it is entirely possible that HEW's approval takes precedence over its guidelines.

We conclude that the district court was not unreasonable in deciding that plaintiffs have raised serious and substantial questions, indicating likely success on the merits. (*Cf. Columbia Heights Nursing Home & Hospital, Inc. v. Weinberger, supra.*)

Affirmed. The application for a stay pending appeal is dismissed.

---

**14.** It perhaps bears emphasizing that this case does *not* involve, and we do not address the issue of, a suit to enjoin deductions based on

"audit exceptions" within the meaning of 45 C.F.R. § 201.13(a).