**STATE OF NEW JERSEY, Petitioner,**

v.

**DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

Nos. 80–2809, 81–1400, 81–1445, 81–2147 and 81–2240.

United States Court of Appeals, Third Circuit.

Argued Oct. 27, 1981.

Decided Dec. 23, 1981.

James R. Zazzali, Atty. Gen. of N. J., Trenton, N. J., for petitioner; Erminie L. Conley, Asst. Atty. Gen., Trenton, N. J., of counsel; Andrea M. Silkowitz, Deputy Atty. Gen. (argued), Trenton, N. J., on brief.

Juan Del Real, Acting Gen. Counsel, Dept. of Health and Human Services, Washington, D. C., for respondent; James E. Healy, Asst. Regional Atty. (argued), Dept. of Health and Human Services, New York City, of counsel.

Before ADAMS, VAN DUSEN and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

New Jersey petitions for review of a series of decisions by the Grant Appeals Board of the Department of Health and Human Services disallowing certain expenditures submitted for reimbursement by the State in connection with the Child Support Enforcement Act, 42 U.S.C. §§ 651–662. After initially determining that we have jurisdiction to entertain New Jersey's appeal pursuant to 42 U.S.C. § 1316(a), we conclude, both as a matter of statutory construction and as a matter of administrative law, that the Department had sufficient authority to impose the challenged disallowances. Accordingly, we affirm the orders entered by the Board.

I

On January 4, 1975, President Ford signed into law the Child Support Enforcement Act, Pub.L. No. 93–647. The Act made available to the states federal financial assistance "[f]or the purpose of enforcing the support obligations owed by absent parents to their children, locating absent parents, establishing paternity, and obtaining child support." 42 U.S.C. § 651. The authors of the legislation—which was codi-

fied as Part D of Title IV of the Social Security Act, 42 U.S.C. §§ 651–662, and hence became known as the "IV–D" program—left basic responsibility for child support plans with the states, but envisioned "a far more active role on the part of the Federal Government in monitoring and evaluating State programs . . . [and] in undertaking to give direct assistance to the States in locating absent parents and obtaining support payments from them." S.Rep. No. 93–1356, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Ad. News 8133, 8134.

The primary justification for this increased federal role can be discerned from the relevant legislative history. Congress was concerned about the "rapid and uncontrolled growth" of expenditures under the Aid to Families with Dependent Children (AFDC) program. In large measure, such growth could be attributed to the failure of the states to ensure that individuals legally obligated to provide child support actually did so. Greater efforts in this regard by both the federal and state governments, it was believed, would reduce overall welfare costs. *Id.* at 8148–50. Moreover, according to one of the Senate sponsors of the IV–D program, "once an effective support collection system is established, fathers will be deterred from deserting their families to welfare and children will be spared many of the effects of family breakup." 120 Cong. Rec. 40,323 (1974) (remarks of Sen. Long).

To achieve these ends, Congress required each state to establish a IV–D program, designed to provide all AFDC recipients with certain child support and paternity services. 42 U.S.C. § 602(a)(27).[1] The legislation specifies that, to qualify for federal financial participation, a state must draw its IV–D plan in accord with certain statutory requirements, set forth at 42 U.S.C. § 654. Among other things, a state IV–D

agency must "enter[ ] into cooperative arrangements with appropriate courts and law enforcement officials" in order to ensure that its child support program is administered in the most effective fashion. *Id.* at § 654(7).

Intent on "creat[ing] a mechanism to require compliance with the law," [1974] U.S. Code Cong. & Ad.News, *supra,* at 8149–50, Congress mandated that a "separate organizational unit" be established within the Department of Health and Human Services (HHS)[2] to administer the IV–D program. 42 U.S.C. § 652(a). That unit, known as the Office of Child Support Enforcement (OCSE), is charged by statute with the responsibility, *inter alia,* for reviewing and approving state IV–D proposals, evaluating their implementation, and ensuring that states comply with federal IV–D standards. Pursuant to congressional directive, OCSE also compiles and submits "full and complete report[s]" detailing all activities, expenses, and problems associated with federal and state child support programs. *Id.* Finally, under 42 U.S.C. § 654(13), states are required to "comply with such other requirements and standards as the Secretary [of HHS] determines to be necessary to the establishment of an effective [IV–D] program."

Congress did not limit the availability of IV–D services to those individuals who received AFDC monies, however. The legislators recognized that "the problem of nonsupport is broader than the AFDC rolls" and that "many families might be able to avoid the necessity of applying for welfare in the first place if they had adequate assistance in obtaining the support due from absent parents." [1974] U.S.Code Cong. & Ad.News, *supra,* at 8158. Consequently coverage under the Child Support Enforcement Act was extended to include *non-*AFDC recipients as well. Specifically, Congress provided that:

---

1. AFDC recipients, in turn, are obligated to accept such services as a condition of their eligibility for aid. 42 U.S.C. § 602(a)(26).

2. The Department of Health, Education, and Welfare (HEW), originally responsible for the IV D program, was redesignated the Depart-

ment of Health and Human Services (HHS) by Pub.L. No. 96–88, § 509, 93 Stat. 695 (1979). This opinion will refer in all instances to HHS, even though many of the events discussed herein occurred while HEW was still in existence.

the child support collection or paternity determination services established under [a state's IV–D] plan shall be made available to any individual not otherwise eligible for such services upon application filed by such individual with the State . . . .

42 U.S.C. § 654(6)(A). The statute authorizes a state to impose a "reasonable" application fee on non-AFDC recipients seeking IV–D services, *id.* at § 654(6)(B), and permits a state to deduct its additional administrative expenses from any recovery ultimately obtained from a delinquent parent, *id.* at § 654(6)(C). OCSE was instructed to pay particular attention to the non-AFDC aspects of the IV–D effort. As part of its periodic reporting obligation, OCSE was to identify:

> (i) the total amount of child support payments collected as a result of services furnished . . . to individuals under [42 U.S.C. § 654(6)], (ii) the cost to the States and to the Federal Government of furnishing such services to those individuals, and (iii) the extent to which the furnishing of such services was successful in providing sufficient support to those individuals to assure that they did not require assistance under the State [AFDC plan].

42 U.S.C. § 652(a).

In mid-1975, pursuant to its statutory authority, HHS promulgated a series of administrative regulations covering the IV–D program. *See* 45 C.F.R. §§ 301.0–306.40 (1980). One such regulation restates the requirement that states make child support services available to non-AFDC individuals, as well as to AFDC recipients:

> The State plan shall provide that the child support collection or paternity determination services established under the plan shall be made available to any individual not otherwise eligible for such services upon application filed by such individual with the IV–D agency.

*Id.* at § 302.33(a). As is apparent, the regulation tracks the language of section 654(6)(A) of the Act, save for its final clause: while the statute requires only that

applications by non-AFDC individuals be filed "with [a] State," the regulation specifies that such applications be filed "with [a] IV–D agency."

Neither the statute nor the regulation elaborate upon the application requirement; that is, neither the statute nor the regulation addresses the format or the timeliness of the application itself. On June 9, 1976, however, OCSE issued a "program instruction" setting forth certain procedures to be followed by states seeking reimbursement of costs for services provided to non-AFDC persons. OCSE noted that both the statute and the regulation make reimbursement contingent "upon application filed by [a non-AFDC] individual." Therefore, states were informed that "[i]n order to comply with the statutory requirements, . . . [an] application must be in writing . . . [and] must be signed by the individual applying for child support services" before federal funds could be received. App. at 59a. Additionally, OCSE observed that, while a number of states made non-welfare recipients eligible for child support services prior to the enactment of the Child Support Enforcement Act, none of those previously existing state plans was "grandfathered" into the IV–D program adopted by Congress. Thus, states were instructed that "[a]pplications filed prior to the effective date of title IV–D . . . do not make a case eligible for Federal financial participation under title IV–D." *Id.* at 60a–61a.

In a subsequent communication, OCSE established August 1, 1976, as the effective date of the June 9 program instruction. Appropriate state officials were urged to "proceed immediately" to obtain "new applications" for child support services from non-AFDC individuals, "so that you do not suffer any loss of Federal funds." Letter from J. Steigman, Deputy Regional Director, OCSE (Sept. 20, 1976), App. at 66a–67a.

## II

On July 1, 1975, New Jersey commenced participation in the national IV–D program. Retroactive to that date, New Jersey's Divi-

sion of Public Welfare entered into a cooperative agreement, as required under 42 U.S.C. § 654(7), with the State's Administrative Office of the Courts (AOC). That agreement obligated the AOC to furnish those services required of the State under the IV–D Act; in exchange, the Division of Public Welfare was to forward to the AOC whatever amounts it received as reimbursement for its IV–D expenditures from HHS. Brief for Petitioner at 1.

Prior to the enactment of the Child Support Enforcement Act, New Jersey, not unlike other states, provided child support collection and paternity locater services through its state courts and county probation departments. *See* 2A N.J.Stat.Ann. § 168–11(b) (West); N.J.Ct.R. 4:79–9(a) & (b). These services were made available, pursuant to court order, to any eligible person, regardless of whether that person was a welfare recipient. Thus, at the time New Jersey entered the IV–D program, thousands of child support cases—many of them involving non-AFDC individuals—already were pending with local probation offices, and the authorities proceeded to process them in connection with applicable IV–D rules and regulations.

New Jersey received a copy of the OCSE program instruction concerning the non-AFDC application requirement on July 19, 1976. Shortly thereafter, an official in New Jersey's Division of Public Welfare recommended that the AOC undertake "immediate action . . . in order to assure that New Jersey will remain eligible for Federal reimbursement in non-public assistance cases." Specifically, the AOC was urged to secure new, signed applications from "all

persons seeking child support enforcement services." Letter from P. Timlen, Coordinator, Child Support and Paternity Unit (Aug. 19, 1976), App. at 64a–65a. In response to this directive, the AOC, acting through county probation offices, attempted to obtain signed requests for IV–D services from all non-AFDC recipients, "including those who had initially petitioned the courts for assistance in obtaining child support payments many years before New Jersey's entry into the IV–D Program." Affidavit of F. Fant, Assistant Director for Probation, AOC (Mar. 15, 1978), App. at 68a–69a.

For a variety of reasons, however, the AOC was unable to acquire new IV–D applications from all non-AFDC individuals to whom the State provided child support services.[3] By March 31, 1977, for example, signed applications had been secured from only 60–65% of the non-AFDC population.[4] While that percentage increased in the months that followed, as late as June 30, 1980, New Jersey was continuing to report less-than-complete compliance with the new application requirement. App. at 54a.

As a result, in a series of determinations covering the period from August 1, 1976, through June 30, 1980, OCSE regional officials disallowed $1,772,920 of IV–D expenditures for which New Jersey sought reimbursement. These various disallowances represented the amount of child support services provided by the State to non-AFDC individuals from whom as yet no application had been obtained. App. at 43a–57a. New Jersey challenged the disallowances through appropriate HHS administrative proceedings.[5] In the main, the State ar-

---

3. According to one New Jersey official responsible for implementing the new application requirement, the AOC's inability, despite its "good faith efforts," to obtain signed requests for IV–D services from all non-welfare persons could be attributed to "inordinate numbers of applicants to contact; changes in addresses noted in probation department files and; recipient refusal to sign the applications based upon advice of counsel." Affidavit of F. Fant, *supra*, App. at 69a.

4. New Jersey probation departments did not begin to submit statistics segregating their

caseloads into AFDC and non-AFDC categories until June 1977. Brief for Petitioner at 4. Therefore, the 60% and 65% figures cited above represent estimates arrived at by the respondent and the petitioner, respectively, based on statistics compiled by the AOC during the July 1976-March 1977 period. *Id.*; Brief for Respondent at 5; App. at 70a–76a.

5. New Jersey filed separate requests for reconsideration of the disallowances covering August 1, 1976, through December 31, 1978, with the Director of OCSE. In February 1980, the Director upheld these disallowances, but noted

gued that, instead of requiring new applications for members of the non-AFDC population, OCSE should have accepted court orders, complaints, or other "objective indicia" of a need by such individuals for child support services.

The HHS Departmental Grant Appeals Board rejected this, as well as other arguments proffered by New Jersey.[6] The Board held that OCSE could insist that a state obtain signed, post-1975 applications from non-AFDC recipients in order to be eligible for federal reimbursement. The Board acknowledged that neither the IV–D statute nor its legislative history explicitly directed that such new applications be secured. Nonetheless, it reasoned that, "in the absence of an express reference in Title IV–D to services provided prior to the effective date of that title, it [cannot] clearly be inferred that new applications are not required." Faced with this ambiguity, the Board concluded that the proper result was to defer to the agency's interpretation of its own statute. It maintained that it could logically be assumed that Congress would not want to provide child support services to individuals who failed to submit IV–D applications, since the failure to submit IV–D applications "might arguably reflect the absence of any serious desire for continued services." There was no reason to believe, moreover, that the "minimal" burden placed on states by the new application requirement served to frustrate, to any significant degree, the overall objectives of the IV–D program. In addition, the Board determined that there was no violation of the Administrative Procedure Act (APA) when OCSE issued its June 9, 1976, program instruction. That instruction was "interpretative" in nature, the Board concluded, and, as such, need not have been promulgated in accordance with the provisions of the APA. Dec. No. 135 (Nov. 28, 1980), App. at 1a–7a.

New Jersey seeks direct review in this Court of the Grant Appeals Board decisions.

### III

Before we can address the merits of this appeal, two preliminary questions must be resolved. HHS maintains, first, that this Court does not have jurisdiction to review the petitions presented by New Jersey. The Department further contends that, even if jurisdiction properly lies with this Court, the State has yet to exhaust its administrative remedies. For the reasons that follow, we reject both of these arguments.

### A

New Jersey argues that the denial of federal monies challenged here is expressly grounded upon the Secretary's conclusion that the State failed to comply with the statutory requirement that IV–D applications be obtained. Therefore, the State urges, jurisdiction exists under 42 U.S.C. § 1316(a), which authorizes direct review by a court of appeals of determinations involving the conformity of a state's AFDC plan to federal standards. HHS, on the other hand, argues that this case simply entails the disallowance of discrete expenditures for which New Jersey erroneously sought reimbursement, rather than the question of

that, as the result of a recent HHS reorganization plan, *see* 45 C.F.R. §§ 16.90–16.91, only the Departmental Grant Appeals Board had authority to make final determinations with respect to the reconsideration of disallowances. App. at 37a–42a. Accordingly, New Jersey filed an application with the Board to review the Director's decision. The State appealed all subsequent disallowances entered by OCSE regional officials (*i.e.*, those covering January 1, 1979, through June 30, 1980) directly to the Board.

6. These consolidated petitions for review challenge five separate determinations of the HHS Grant Appeals Board. *See* Dec. No. 135 (Nov. 28, 1980), App. at 1a–7a; Dec. No. 146 (Jan. 29, 1981), App. at 16a; Dec. No. 153 (Feb. 27, 1981), App. at 17a–18a; Dec. No. 195 (June 30, 1981), Supp. App. at 11a–12a; Dec. No. 199 (July 31, 1981), Supp.App. at 21a–22a. Dec. No. 135, the only one of these decisions to discuss fully the relevant legal issues, relied heavily upon the analysis employed and the conclusions reached in a previous reconsideration determination involving the State of New York. *See* Dec. No. 101 (May 23, 1980), App. at 8a–15a.

whether the State's plan, as a whole, conforms to applicable national requirements. HHS insists that the governing statute is 42 U.S.C. § 1316(d), which does not provide for immediate appellate-level judicial review. In order to determine which of these two competing schemes is applicable to the dispute here, it is necessary to undertake a somewhat extended journey through the relevant statutory and regulatory bramble.

Title IV of the Social Security Act makes federal matching funds available only to states that "have submitted, and had approved by the [Secretary of HHS], State plans for aid and services to needy families with children," 42 U.S.C. § 601. In this regard, the Act requires the Secretary to determine, within ninety days of receipt of a proposed state AFDC plan, whether that plan "conforms to the requirements for approval" set forth in various sections of Title IV. *Id.* at § 1316(a)(1); *see* 45 C.F.R. § 201.3. If the Secretary ascertains that it does not, the state may request administrative reconsideration by the Secretary, in the form of a plan-conformity hearing. *See* 42 U.S.C. § 1316(a)(2); 45 C.F.R. § 201.4. Should the state's plan once again be rejected, the Act provides that the state "may, within 60 days after it has been notified of such determination, file with the United States court of appeals for the circuit in which such State is located a petition for review of such determination." 42 U.S.C. § 1316(a)(3); *see* 45 C.F.R. § 201.7. Upon review, a court of appeals must accept as conclusive all findings of fact by the Secretary, "if supported by substantial evidence," 42 U.S.C. § 1316(a)(4); otherwise, the court is free "to affirm the action of the Secretary or to set it aside, in whole or in part," *id.* at § 1316(a)(5).

According to the Act and accompanying regulations, the three-tiered plan-conformity procedure set forth in section 1316(a)— *i.e.*, initial determination, administrative reconsideration. and appellate review—is to be used not only when state AFDC plans are offered to HHS for approval, but in other situations as well. Once a state plan is in effect, for example, any amendment thereto may be treated, at the option of the

state, as the submission of an entirely new plan, thereby triggering the plan-conformity *modus operandi*. *See* 42 U.S.C. § 1316(b); 45 C.F.R. § 201.3(f). Similarly, section 1316(a) review would be necessary were the Secretary to determine, pursuant to 42 U.S.C. § 604(a)(2), that "in the administration of" a state's AFDC plan "there is a failure to comply substantially" with any requirement enunciated in 42 U.S.C. § 602(a) (*e.g.*, the requirement that a state establish a IV–D program, *id.* at § 602(a)(27)). *Id.* at § 1316(a)(3). By regulation, HHS has defined substantial noncompliance to include, among other things, "the failure of [a] State in practice to comply with a Federal requirement, whether or not its State plan has been amended to conform to such requirement." 45 C.F.R. § 201.6(a).

■ If the Secretary ascertains for whatever reasons, that a state's AFDC plan, either on its face or in its administration, does not conform to federal standards, the Secretary is obligated to terminate the payment of federal funds for the offending plan (or, at his or her discretion, to limit payments to those parts of the state plan "not affected by" the noncompliance) until satisfied that "there is no longer any such failure to comply." 42 U.S.C. § 604(a); *see* 45 C.F.R. § 201.6(e); *id.* at § 213.32(c). In other words, a sanction assessed pursuant to a plan-nonconformity determination is prospective in nature, and generally is imposed to remedy a broad, pervasive defect in a plan as a whole. *See, e.g., Arizona State Department of Public Welfare v. HEW*, 449 F.2d 456 (9th Cir. 1971), *cert. denied*, 405 U.S. 919, 92 S.Ct. 945, 30 L.Ed.2d 789 (1972); *Connecticut State Department of Public Welfare v. HEW*, 448 F.2d 209 (2d Cir. 1971); *Gardner v. State of Alabama, Department of Pensions and Security*, 385 F.2d 804 (5th Cir. 1967), *cert. denied*, 389 U.S. 1046, 88 S.Ct. 773, 19 L.Ed.2d 839 (1968). As if to undermine the gravity of this potential penalty, HHS regulations specify that, before a compliance hearing is ordered, agency authorities are to make a "reasonable effort ... to resolve the ques-

tions involved by conference and discussion with State officials," 45 C.F.R. § 201.6(c), and that, should such a hearing nonetheless occur, the full panoply of trial-type procedural protections be afforded to the state, *see id.* at §§ 213.1.–.33.

This description of the plan-conformity review arrangement set out in section 1316(a) must be qualified in a number of respects when considering the IV–D child support program. First, no explicit statutory provision makes section 1316(a) procedures apposite in the IV–D context. Nonetheless, the applicability of these procedures can be inferred with little difficulty, given that state IV–D plans are reviewed and approved by OCSE before they become effective, 42 U.S.C. § 652(a)(3), that OCSE is directed to "evaluate the implementation of State [IV–D] programs," *id.* at § 652(a)(4), and that a determination that a state's IV–D plan or program is not in compliance necessarily constitutes a determination that the state's AFDC program is not in compliance, *see id.* at § 602(a)(27). Second, the IV–D program contains a requirement not present in other aspects of the AFDC statutory scheme, namely, that the Secretary conduct a "complete [annual] audit of the programs established under [the IV–D] plan in each State [in order to] determine . . . whether the actual operation of such programs in each State conforms to [federal] requirements." *Id.* at § 652(a)(4); *see* 45 C.F.R. §§ 305.0.–50. According to regulations promulgated by HHS, noncompliance determinations arising directly from such an audit are not reviewed under the provisions of section 1316(a). Rather, if the Secretary concludes "on the basis of the results of the [section 652(a)(4)] audit" that a state has "failed to have an effective child support enforcement program," the disallowance procedures set forth in section 1316(d) —discussed in more detail below—are applicable. 45 C.F.R. § 305.50; *see id.* at § 205.146(e). Finally, whereas a finding that a state's AFDC program is not in compliance may result in a cutoff of all federal dollars to that program, *see* 42 U.S.C. § 604(a), the maximum penalty that can be imposed when HHS determines that a state's IV–D program is not in compliance is the withholding of five percent of the quarterly AFDC payments otherwise due the offending state. 42 U.S.C. §§ 604(d) & 603(h).

In contrast to the plan-conformity provisions of section 1316(a) are the disallowance review procedures set forth in 42 U.S.C. § 1316(d). According to statute, HHS periodically forwards to each participating state an amount equivalent to that state's projected financial needs under the IV–D program, "reduced or increased to the extent of any overpayment or underpayment which the Secretary determines was made [previously]." *Id.* at § 655(b)(2). By regulation, HHS has interpreted this statutory provision as authorization to disallow specific expenditures, presented for reimbursement by a state, determined by the Secretary to be impermissible under federal or state IV–D standards. *See* 45 C.F.R. § 304.29. In this connection, the Social Security Act provides, in relevant part:

> Whenever the Secretary determines that any item or class of items on account of which Federal financial participation is claimed under [*inter alia,* a state's AFDC plan] shall be disallowed for such participation, the State shall be entitled to and upon request shall receive a reconsideration of the disallowance.

42 U.S.C. § 1316(d). If HHS concludes, therefore, that certain IV–D expenditures claimed by a state should be disallowed, the agency is obligated to notify the state of the availability of administrative reconsideration, *see* 45 C.F.R. § 201.14(a). Thereupon, if the state so desires, it may request and obtain a hearing before the HHS Departmental Grant Appeals Board. *See id.* at §§ 201.14 & 16.1.–91. The Board, after considering all pertinent facts, laws, and regulations, proceeds to issue "a written decision" that constitutes "final administrative action on the matter." *Id.* at § 201.-14(d)(11).

■ Section 1316(a) explicitly provides for direct court of appeals review of all plan-nonconformity determinations. There is no corresponding judicial review provi-

sion set forth in section 1316(d), however. Either of two conclusions can be drawn from this silence. It may be argued that section 1316(d), by implication, altogether forbids judicial review, by any court, of an administrative disallowance decision made under the Social Security Act.[7] Alternatively, following *County of Alameda v. Weinberger,* 520 F.2d 344, 347–49 (9th Cir. 1975), it might be argued that jurisdiction to review disallowances lies with the federal district courts. Although HHS on occasion has argued that no federal court has jurisdiction to review disallowances, the Department apparently no longer holds to such a view.[8] In any event, it is sufficient to note that, regardless of whether a district court has jurisdiction to examine a disallowance determination, it is clear that initial appellate court review of such a determination is not authorized. *See Medical Services Administration v. United States,* 590 F.2d 135, 136 (5th Cir. 1979).

A number of other observations concerning disallowance procedures are of some pertinence. First, whereas a finding of plan-nonconformity results in the application of a prospective sanction (*i.e.,* federal funds are terminated in whole or in part for the offending state program), disallowance determinations are retrospective in effect (*i.e.,* federal reimbursement is denied for specific unauthorized expenditures previously incurred by a state). Second, plan-conformity disagreements, by their very nature, concern either the validity of a state's plan as a whole or its overall administration. Disallowance disputes, however, are far more narrowly focused: they generally arise "in connection with a routine audit" and involve "the accuracy of [that] audit," *see Medical Services Administration, supra,* at 136.[9] Finally, it is worth repeating, if only to avoid confusion, that HHS regulations provide for the use of section 1316(d) disallowance procedures not only in the routine situation where the agency denies reimbursement for an unauthorized IV–D claim, *see* 45 C.F.R. § 304.29, but also in connection with the annual IV–D compliance audit required of the agency under 42 U.S.C. § 652(a)(4), *see* 45 C.F.R. § 305.50.

■ At first blush, it might appear that HHS' refusal to reimburse New Jersey for IV–D expenditures in the absence of new applications from non-AFDC recipients should be treated, for purposes of the jurisdictional question involved here, as a disal-

---

7. There is some support in the legislative history for such a contention. One sponsor of an amendment to the Social Security Act that provided for judicial review of HHS administrative decisions inserted in the *Congressional Record* the following recommendation from a 1964 report of the Advisory Commission on Intergovernmental Relations:

> Some States and local officials believe that some form of judicial review should encompass all aspects of the public assistance programs, including matching issues or audit exceptions. However, the much greater concern is for review of decisions regarding plan-conformity issues. The Commission believes that to involve audit exceptions or issues other than those of plan conformity in the judicial review process would create many additional problems.

111 Cong.Rec. 3068 (1965) (remarks of Sen. Javits). One court of appeals apparently has accepted, albeit in dictum, the argument that no judicial review is available with respect to § 1316(d) disallowances. *See Texas Department of Public Welfare v. Califano,* 556 F.2d 326, 329 & n.4 (5th Cir. 1977), *cert. denied,* 439 U.S. 818, 99 S.Ct. 78, 58 L.Ed.2d 108 (1978).

8. Both at oral argument and in a supplemental statement provided to this Court, counsel for HHS represented that, were this Court to dismiss the present petitions for lack of jurisdiction, and were New Jersey subsequently to seek review in a district court, the Department would "not contest the jurisdiction of that Court to review the decisions of the Grant Appeals Board at issue herein." Supplemental Statement by J. Healy, Office of General Counsel, HHS (Nov. 3, 1981).

9. Perhaps the best distinction between matters appropriate for resolution under § 1316(a) and those appropriate for resolution under § 1316(d) can be found in the Senate Report that discusses the Social Security Act's judicial review provisions: Plan-conformity questions "concern[ ] State plan proposals" and "involve discontinuance of Federal payments under part or all of a State plan"; disallowance determinations, on the other hand, "usually take the form of audit exceptions" and "occur when the Secretary disallows specific State expenditures for Federal financial participation." S.Rep. No. 404, 89th Cong., 1st Sess., *reprinted in* [1965] U.S.Code Cong. & Ad.News 1943, 2091.

lowance under section 1316(d). The agency did not conclude that New Jersey's AFDC plan, which has been in effect for many years, was somehow not in compliance with federal statutes and regulations; nor did the Secretary determine that the State, while purporting to operate under a previously approved plan, had substantially deviated from it in practice. On the contrary, HHS found New Jersey's plan and its administration entirely satisfactory, but instead objected to the State's attempt to claim IV–D funds for individuals who had not filed what HHS deemed to be an appropriate application. At no time during the administrative proceedings to date, therefore, did HHS employ the plan conformity-related provisions described above, e.g., no compliance hearing was conducted by the agency in this matter. Additionally, the Secretary did not attempt to invoke the statutory penalty associated with a finding of nonconformity on the part of a state's IV–D plan, i.e., a five percent reduction in the total amount of AFDC monies otherwise payable to the state. Primarily for these reasons, HHS asserts that it has done no more than to disallow certain expenditures wrongly claimed by New Jersey. As such, the agency contends that a section 1316(a) review is improper and that the State's petitions for review should be dismissed for lack of jurisdiction.

We decline, however, to adopt an approach which would permit the Secretary to foreclose judicial review under section 1316(a) in situations where one administrative route is pursued when another would be more appropriate. HHS, for example, should not be entitled to categorize as a "disallowance" what, in essence, amounts to a determination that a state's IV–D program does not conform to a federally mandated requirement. We agree with New Jersey, therefore, that in deciding whether section 1316(a) or section 1316(d) procedures are applicable, a court of appeals is obligated to look beyond the label the Secretary puts on his or her actions, and instead is required to conduct an independent evaluation of the underlying substance of the dispute. To do otherwise would be to elevate form over substance, and, in practice, would make the jurisdiction of a court of appeals contingent upon the Secretary's unfettered discretion.

Our reasoning in this regard is consonant with the pragmatic approach to section 1316 jurisdiction employed by other federal courts. In the lead case, *Texas Department of Public Welfare, supra*, note 7, HHS denied a Texas claim for $92 million on the ground that reimbursement was sought for services "not covered or purchasable under [Texas'] approved State Plan." 556 F.2d at 331. When Texas filed a petition for review before the Fifth Circuit, HHS contended that a court of appeals lacked jurisdiction to hear the State's complaint. Specifically, the agency insisted that it simply had "disallowed" the State's claim under section 1316(d), and that therefore section 1316(a)-type review was unavailable. The court, however, after observing that "[t]he unusual circumstances of this case do not fall neatly into any usual classification," refused to grant HHS' motion to dismiss. On the contrary, after "reviewing the Act, the statutory history, and the circumstances of the claim," the court concluded that "the purposes of the Act and the equities are best served by treating this case as a plan-conformity dispute under section 1316(a)." *Id.* at 330. In a subsequent decision, a different panel of the Fifth Circuit reached the opposite result—it concluded that, given the facts of the dispute, section 1316(d) review procedures were applicable—but nonetheless employed the same functional analysis. *See Medical Services Administration, supra.* The second panel posed the jurisdictional issue in terms of "how we categorize" the so-called "deduction" imposed by HHS upon the amount of Medicaid funds made available to Alabama. In the course of making that categorization, and thereby resolving the jurisdictional question, the court observed that "it may not be easy in some cases to determine whether a particular dispute involves a disallowance," 590 F.2d at 136. Similarly, in *Solomon v. Califano*, 464 F.Supp. 1203 (D.Md.1979), the court, after considering the nature of the

underlying dispute, observed that "the present problem does not fall neatly under either [the disallowance or plan conformity] category," and, citing *Texas Department of Public Welfare*, opined that "procedurally, th[e] matter more closely approximates a non-conformity than a disallowance issue." *Id.* at 1208. *See also Wingate v. Harris*, 501 F.Supp. 58, 62–64 (S.D.N.Y.1980); *State of Georgia, Department of Human Resources v. Califano*, 446 F.Supp. 404, 412–13 (N.D. Ga.1977).[10]

■ Following *Texas Department of Public Welfare* and its progeny, therefore, our task with respect to the petitions presently under review is to determine whether the denial by HHS of New Jersey's claim for reimbursement is more like a plan conformity dispute under section 1316(a), or more like a disallowance determination under section 1316(d). After careful consideration of the contentions of both parties, we have concluded that the controversy at bar involves not merely an audit disallowance, but rather raises difficult and significant legal issues having to do with the construction of the Social Security Act, the interpretation of congressional intent with respect to the IV–D program, and the legality of certain HHS administrative actions. HHS' refusal to reimburse some of New Jersey's IV–D expenses because no new non-AFDC applications have been obtained amounts, in effect, for purposes of the section 1316 jurisdiction question, to a determination that New Jersey, in the administration of its state plan, is not conforming to applicable federal regulations. Accordingly, we hold that "the purposes of the Act and the equities are best served by treating this case as a plan-conformity dispute under section 1316(a)," *Texas Department of Public Welfare, supra*, 556 F.2d at 330.

We believe that our consideration of this dispute under the jurisdictional auspices of section 1316(a) can be justified on a number of grounds. First, the plan-conformity approach appears more appropriate when the issue involved in the present appeal is juxtaposed with the issue raised in each of the previous *Texas Department of Public Welfare*-type cases. In *Texas Department of Public Welfare*, for example, HHS "disallowed" various Social Security expenses claimed by the State because the agency believed those expenses to be either "outside the scope of" the approved state plan,

10. It is arguable that the *Texas Department of Public Welfare* approach to the § 1316 jurisdiction problem was not followed in recent decisions of the Sixth and Ninth Circuits. *See Department of Public Health, State of Tennessee v. Departmental Grant Appeals Board, HHS*, 672 F.2d 916 (6th Cir. 1981); *State of Washington, Department of Social and Health Services v. Schweiker*, No. 81–7414 (9th Cir. Sept. 29, 1981). In the *State of Washington* decision, a two-Judge motions panel, in a two-paragraph order, granted HHS' motion to dismiss a petition for review on the ground that "[j]urisdiction to review the disallowance determination, made under 42 U.S.C. § 1316(d), lies in the district court and not in this court." We recognize that it is possible to interpret this decision as holding that the Secretary's administrative categorization of a dispute should be controlling for § 1316 jurisdiction purposes, *i.e.*, should the Secretary proceed under § 1316(d), jurisdiction lies with the district court, but should the Secretary follow § 1316(a), review at the court of appeals level would be appropriate. The *State of Washington* court gave no reason for its order, however. In our opinion, it is just as likely that the Ninth Circuit, rather than rejecting *sub silentio* the functional analysis adopted in *Texas Department of Public Welfare*, instead concluded on the basis of the facts presented in Washington's petition, that the administrative action under review was properly classified as a disallowance determination by HHS in the first place. This reading is buttressed by the fact that the Ninth Circuit cites *Medical Services Administration* in support of its order to dismiss. As noted previously, *Medical Services Administration* explicitly employed the underlying-nature-of-the-dispute analysis set forth in *Texas Department of Public Welfare*. Similarly, in *State of Tennessee*, the court noted that "there was no finding of failure to comply with the state plan," and therefore dismissed for lack of jurisdiction a petition to review HHS' disallowance of certain funds on the ground that Tennessee had failed to establish "the required control over utilization of [certain Medicaid] services" pursuant to 42 U.S.C. § 1396b(g)(1). For present purposes, however, it should be realized that the Sixth Circuit dismissed the petition only after observing that "it appears that this reduction is a 'disallowance,'" and after citing *Medical Services Administration*.

or else submitted for a fiscal year during which a state plan was "not in operation with respect to the claimed expenditures." 556 F.2d at 331. The Fifth Circuit refused to treat this matter as a disallowance dispute because, in its opinion, "[t]he record reveals that [HHS'] reasons for denying the . . . claim amount to a finding of nonconformity with Texas DPW's approved plan and with federal requirements." In this regard, the court was particularly impressed by the statements of two HHS officials. One observed that " 'there was, for the purposes of this decision, no State plan,' " and the other explained that " 'the claims are not proper and allowable under the provisions of your State plan and the law and regulations.' " *Id.* The court concluded, therefore, that

> the dispute in this case results largely from [HHS'] attempt to deal in a summary manner with a substantial Texas DPW claim for expenditures for services which [HHS] considered to differ materially from those approved as part of Texas DPW's approved state plan. In view of the statutory history of the judicial review amendments of the Act, we conclude that the dispute should be resolved by means of the procedure established by Congress for dealing with plan-conformity issues, 42 U.S.C. § 1316(a).

*Id.* at 332. Likewise, in *Solomon v. Califano, supra,* Maryland sued to prevent HHS from recovering what the agency believed to be payments by the State to various nursing homes in excess of federal statutes and regulations. Once again, the "disallowance" label imposed by HHS on its own administrative activity was ignored by the court. In justifying a remand to the Department for a compliance hearing under section 1316(a), the *Solomon* court observed that the essential "underlying problem" giving rise to the lawsuit was Maryland's alleged failure to calculate certain Medicaid expenses "in accordance with the requirements of its state plan." The court concluded:

> The Medicaid provisions of Title XIX of the Social Security Act . . . require the State plan to meet certain federal requirements. . . . Implicit in that requirement is the demand that the State, in its administration of the Medicaid program, comply with the provisions of the plan. Thus, a failure to administer the program in compliance with the plan is a non-conformity with the provisions of applicable federal law. . . .

464 F.Supp. at 1208 (citations omitted).

In contrast to the *Texas Department of Public Welfare* and *Solomon* decisions are those cases in which it was apparent, from the facts of the controversies, that disallowance-related procedures were appropriate. In *Medical Services Administration, supra,* for example, HHS "disallowed" certain Medicaid funds requested by Alabama after an audit report revealed a two month lag between "the time ineligibility for Medicaid was determined and the time this information was communicated to Alabama's fiscal agents responsible for processing Medicaid claims." 590 F.2d at 136. The court dismissed Alabama's petition for review for lack of jurisdiction under section 1316(a):

> [HHS contends that] where the crux of the matter concerns the accuracy of an audit, as here, then the deduction is to be considered a "disallowance." We agree. The record shows that basically this case concerns an audit dispute. While it may not be easy in some cases to determine whether a particular dispute involves a disallowance . . . there is no difficulty in the instant case.

*Id.* The *Medical Services Administration* case did not involve a disagreement as to the "definition of eligibility" under the Alabama plan. Rather, the "isolated and highly focused" inquiry conducted by HHS had to do with whether, in practice, the State was providing Medicaid only to those individuals actually eligible under the State's plan. Accordingly, the Fifth Circuit reasoned, it lacked jurisdiction to review what amounted to a complaint concerning the results of a "routine audit." *Id.* Similarly, in *State of Georgia, Department of Human Resources, supra,* the court, while acknowledging the validity of the *Texas Department of Public Welfare* approach to the

section 1316 jurisdiction problem, reached a different result in light of the factual nature of the controversy under review:

> Unlike the *Texas DPW* case, the case sub judice is not properly characterized as a plan conformity dispute. [HHS] did not terminate reimbursement of all physicians' services; rather it merely refused to pay the cost of services which exceeded the State plan. There is no dispute between Georgia and [HHS] as to the type of services covered by the Georgia plan or even as to the cost of services which are reimbursed pursuant to the plan. The only dispute is a clerical one: whether Georgia, in fact, overpaid physicians for services rendered. For these reasons, this Court concludes that the dispute between Georgia and [HHS] is properly classified as an audit dispute under section 1316(d).

446 F.Supp. at 413. To the same effect, see *County of Alameda, supra,* 520 F.2d at 347 ("disallowance," where HHS deducted $11 million from the State's Social Security claim, in order to compensate for alleged previous overpayments due to the State's using an erroneous reimbursement formula); *Wingate v. Harris, supra,* 501 F.Supp. at 63 ("the dispute in this case involves disallowance of a class of items—claims relating to three decertified nursing homes—and not 'plan conformity' ").

The administrative determination about which New Jersey complains would appear to resemble more a finding of overall noncompliance with federal requirements, in the sense of *Texas Department of Public Welfare* and *Solomon,* than it does a technical, audit-connected shortcoming, as was the situation in *Medical Services Administration* and similar cases. HHS does not contend that the present controversy arose because the State made a "clerical" mistake with respect to computation of the amount of services to be provided to non-AFDC persons seeking child support assistance, *cf. State of Georgia, Department of Human Resources* ; nor does the Department assert that the State sought too much IV–D reimbursement from the federal government due to the employment of an erroneous formula, *cf. County of Alameda.* Rather,

HHS denied funds to New Jersey because, from the agency's perspective, the State failed to abide by an explicit requirement upon which the receipt of federal funds was conditioned—namely, that applications be obtained from non-AFDC individuals who qualify for IV–D services. Here, as in *Texas Department of Public Welfare,* HHS' "reasons for denying the . . . claim amount to a finding of nonconformity with . . . federal requirements," 556 F.2d at 330–31. It cannot be said, moreover, that the "disallowances" imposed here originated "in connection with a routine audit of specific claims submitted by the state to [HHS] for reimbursement," *Medical Services Administration,* 590 F.2d at 136. Instead, New Jersey's "noncompliance" can be traced directly to the new administrative obligation imposed on the states by the OCSE program instruction of June 9, 1976. Once New Jersey failed to live up to the terms of that instruction, HHS behaved not as if it believed "the crux of the matter [to] concern[ ] the accuracy of an audit," *Medical Services Administration, id.,* but rather as if it had determined that the claims presented by New Jersey were " 'not proper and allowable under . . . the law and regulations,' " *Texas Department of Public Welfare,* 556 F.2d at 331. Finally, it should be noted that in the present case HHS does not contest specific "individual items or classes of items" for which the State seeks reimbursement, as was the case in *Wingate v. Harris,* where claims involving only three nursing homes were under review, *see* 501 F.Supp. at 63. On the contrary, the disallowances imposed by the Department here necessarily implicate the administration of the non-AFDC aspect of New Jersey's IV–D program as a whole. In sum, we believe that the results reached in previous section 1316 cases preclude us from treating New Jersey's petitions for review as involving merely an audit-related disallowance.

Apart from the dictates of previous cases, consideration of this dispute under the plan-conformity review provisions of section 1316(a), as opposed to the disallowance review provisions of section 1316(d), can be

justified on a second ground: such an approach is supported, albeit modestly, on the basis of the relevant legislative history. In explaining the provision that eventually became codified as section 1316(a), Senator Javits remarked that the

> most satisfactory approach to providing judicial review of administrative decisions of the Secretary is to establish a procedure whereby in cases of disagreement between the State agency and the Secretary, court review would occur prior to actual implementation of a proposed change in the State's existing approved plan. This would avoid the necessity for withholding or recouping Federal funds. *Court review would involve a determination of whether* an amendment to the existing plan proposed by the State or *a new administrative requirement promulgated by the Federal agency conformed with the intent of the Federal statute.* Under such procedure there would be no disruption in the operation of the existing approved State plan until agreement between the parties was reached or the court decision was rendered.

111 Cong.Rec. 3068 (1965) (remarks of Sen. Javits) (emphasis added). In the present case, OCSE's instruction that signed, post-1975 applications be obtained from non-AFDC IV–D recipients can be viewed as a "new administrative requirement promulgated by [a] Federal agency." We conclude, following Senator Javits, that under such circumstances, judicial review in a court of appeals should be available in order to determine whether that new requirement "conform[s] with the intent of the Federal statute."

Third, additional support for treating the disagreement between HHS and New Jersey as a plan-conformity matter can be drawn from the Department's own administrative regulations. Under 45 C.F.R. § 205.5(a), a state is obligated to amend its plan "whenever necessary to reflect new or revised Federal statutes or regulations." If New Jersey, immediately after OCSE issued its application instruction, had sought to amend its state IV–D plan to provide explicitly that *no* applications need be obtained from members of the non-AFDC population, HHS of course would have rejected that proposed amendment as inconsistent with Regulation 205.5(a). Had such an alternative procedural route been followed in this case, there can be little doubt that New Jersey, at its option, could have insisted on section 1316(a)-type review— since, according to 42 U.S.C. § 1316(b) and 45 C.F.R. § 201.3(f), any amendment to an approved state plan may be treated as the submission, under section 1316(a), of an entirely new plan. We believe that New Jersey should not be denied the opportunity of receiving plan-conformity review simply because it did not take the *pro forma* step of submitting an obviously unacceptable plan amendment to HHS. Moreover, it could be argued that taking such a step is unnecessary in any event, because 45 C.F.R. § 201.6(a) explicitly provides that "[a] question of noncompliance of a State plan may arise from," among other things, "the failure of the State in practice to comply with a Federal requirement, whether or not its State plan has been amended to conform to [this] requirement." In short, in contending that it would be inappropriate to treat this case under section 1316(a) because there was no Secretarial finding of plan nonconformity, HHS ignores the apparent force of its own regulations.

Fourth and finally, handling this appeal in accord with the provisions of section 1316(a) can be justified in terms of administrative and judicial economy. There is, in a word, little to be gained by dismissing these petitions for lack of jurisdiction, thereby delaying consideration by this Court of the underlying merits until, many months from now, an appeal can be brought from a final determination of a district court.[11] As a

---

11. This argument assumes, of course, that if these petitions were dismissed for lack of jurisdiction, some sort of judicial review would be available at the district court level. *See* note 8 *supra,* and accompanying text. An additional justification for court-of-appeals-level review of a case such as the present might be proffered were it well established that, contrary to the

practical matter, given the uncertainty that accompanies any attempt to administer a statute or regulation under attack in the courts, and given the amount of money involved, it should be in the interest of HHS, no less than in the interest of New Jersey, to have the present controversy resolved with all due haste—at least as long as that resolution can be accomplished consistent with the statutory framework developed by Congress. In light of how closely the dispute between HHS and New Jersey approximates the standard plan-conformity conflict, and in view of the absence of any policy counseling against immediate disposition of this matter on the merits, we hold that, under the circumstances of this case,[12] initial appellate-level review pursuant to 42 U.S.C. § 1316(a) is appropriate.

B

■ HHS interposes a second objection to our consideration of the merits of this appeal. The Department contends that, by bringing this appeal now rather than insisting that a plan-conformity hearing be held pursuant to 42 U.S.C. § 1316(a)(2), New Jersey has failed to exhaust its administrative remedies. HHS points out that in both of the previous cases in which it was determined that section 1316(a) procedures were appropriate, a remand was ordered so that a full plan-conformity hearing could be conducted by the agency. See Texas Department of Public Welfare, supra, 556 F.2d at 332; Solomon v. Califano, supra, 464 F.Supp. at 1209.

As a general rule, of course, a party must attempt to exhaust all available administrative remedies before seeking judicial relief. See Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938). The Supreme Court has instructed, however, that "[t]he requirement of exhaustion is a matter within the sound discretion of the courts," NLRB v. Industrial Union of Marine & Shipbuilding Workers, 391 U.S. 418, 426 n.8, 88 S.Ct. 1717, 1722, 20 L.Ed.2d 706 (1968). See Cerro Metal Products v. Marshall, 620 F.2d 964, 970 & n.10 (3d Cir. 1980). Our Court has recognized that, "[a]s a judicially created doctrine, the requirement of exhaustion has traditionally been waived" in those situations where "exhaustion [would be] 'futile,'" Susquehanna Valley Alliance v. Three Mile Island Nuclear Reactor, 619 F.2d 231, 245 (3d Cir. 1980), quoting United States ex rel. Marrero v. Warden, Lewisburg Penitentiary, 483 F.2d 656, 659 (3d Cir. 1973), rev'd on other grounds, 417 U.S. 653, 94 S.Ct. 2532, 41 L.Ed.2d 383 (1974). See also Tokarcik v. Forest Hills School District, 665 F.2d 443, at 447 n.5 (3d Cir. 1981); Porter County Chapter, Izaak Walton League of America, Inc. v. Costle, 571 F.2d 359, 363 (7th Cir.), cert. denied, 439 U.S. 834, 99 S.Ct. 115, 58 L.Ed.2d 130 (1978); Ogletree v. McNamara, 449 F.2d 93, 99 (6th Cir. 1971); Wolff v. Selective Service Local Board No. 16, 372 F.2d 817, 825 (2d Cir. 1967).

We believe that it would be "futile" to force New Jersey to return to HHS for further administrative proceedings in this matter. There is no factual dispute be-

holding of County of Alameda, supra, disallowance determinations are unreviewable in any court. If such a situation existed, courts would have every incentive to construe the reach of the plan-conformity procedures broadly, lest significant legal disputes be unreviewable due to inartful drafting of § 1316.

12. It should be stressed that we do not hold that New Jersey is entitled to § 1316(a) review merely because its challenge to the HHS "disallowance" is premised on legal, as opposed to factual, grounds. Had Congress wanted courts of appeals to review directly all legal matters surrounding the administration of a state's Social Security-type programs, it of course could have written § 1316 accordingly. Instead,

Congress chose, for whatever reasons, to limit the exclusive jurisdiction of the federal appellate courts only to those situations involving plan conformity. Neither do we wish to imply that any administrative disallowance can be reviewed directly in this Court as long as the protesting state asserts that the disallowance "really" raises compliance-related questions. We do not, after all, resort to such legal legerdemain in this case. Rather, we have independently reviewed the substance of the particular dispute involved here, and have concluded that the question of plan conformity lies at the heart of the claims of which New Jersey seeks review. It is precisely for this reason that § 1316(a) review can be justified.

tween the parties that might be resolved by additional testimony or hearings. Neither the State nor the agency contests, for example, the amount of the "disallowances" under review here. Rather, the concern of both parties focuses upon the legality of those disallowances. And it is quite clear, at this point, what the Department's legal posture is with respect to the need for new IV–D applications for non-AFDC recipients: the HHS Grant Appeals Board, on no less than five separate occasions, has considered and rejected the objections raised by New Jersey to the OCSE instruction. *See* note 6 *supra.* There is nothing in the record that even remotely indicates that the Secretary might adopt any other position were the case to be remanded for a compliance hearing. Moreover, none of the general justifications of the exhaustion doctrine identified by the Supreme Court in *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), appears relevant in the situation at bar: a decision on the merits of the IV–D application question would not "premature[ly] interfere[ ]" with agency processes; because HHS already has made clear its preference with respect to the resolution of those merits, exhaustion is not advisable in order to "afford the parties and the courts the benefits of [the agency's] experience and expertise"; and there exists no need for a remand so that HHS can "compile a record which is adequate for judicial review." *Id.* at 765, 95 S.Ct. at 2466; *see Liberty Alliance of the Blind v. Califano*, 568 F.2d 333, 344–45 (3d Cir. 1977). We conclude, therefore, that to require a formal compliance hearing "at this stage, when the controversy concerns only a legal issue, would not serve the purposes underlying the doctrine requiring exhaustion of administrative remedies or the purposes of Title IV–D," *Reser v. Califano*, 467 F.Supp. 446, 449 (W.D.Mo.1979).

Consequently, HHS's failure to dispose of New Jersey's claims through an official section 1316(a)(2) proceeding does not render the present appeal nonjusticiable.

## IV

■ This then brings us to the merits of the dispute. In this regard, we are asked to decide whether HHS—or, more specifically, OCSE—by issuing a "program instruction," can require New Jersey to secure post-1975, signed applications from non-AFDC recipients before seeking reimbursement for IV–D child support services provided to those individuals. We arrive at an affirmative answer to that question via two alternative routes. First, we believe that the language of the IV–D statute can be said to mandate the obtaining of such new applications. Second, conceding *arguendo* that the language of the statute is ambiguous in this regard, we believe that HHS acted well within its statutory authority and consistent with the Administrative Procedure Act when it published what we have determined to be an interpretative rule regarding the non-AFDC aspect of the title IV–D program.

### A

The Child Support Enforcement Act provides, in relevant part, that various IV–D services established under a state's plan "be made available to any individual not otherwise eligible for such services"—*i.e.*, to any individual not presently receiving AFDC assistance—"*upon application filed by such individual with the State,*" 42 U.S.C. § 654(6)(A) (emphasis added). Relying primarily on the words of this highlighted phrase, the Department maintains that the application requirement imposed by OCSE on state authorities is mandated by the language of the Act itself. New Jersey contends, on the other hand, that section 654(6)(A) should not be read to require a state to obtain new, signed applications from non-AFDC individuals when other documents, verifying the need of such individuals for child support services, are already on file with the state.

As a matter of statutory construction, we accept the Department's argument. To be sure, New Jersey is technically correct that nothing in the statute explicitly "purport[s] to delimit the type of document or the date by which it must be filed in order to entitle

the participating state to federal reimbursement." Brief for Petitioner at 21. We are of the view, however, that HHS did not insist that states such as New Jersey obtain new applications from non-welfare recipients who seek IV–D assistance to satisfy some irrational, bureaucratic whim. On the contrary, the agency did no more and no less than to identify and to implement the congressional directives implicit in the terms of section 654(6)(A) itself.

With respect to New Jersey's contention that post-1975 applications are not demanded by the Act, we observe that section 654(6)(A), read in its entirety, is primarily prospective. The statute does not mandate, for example, that IV–D services be made available to any non-AFDC recipient who either "has filed at some point in the past or will file at some point in the future" an appropriate application. Rather, the provision of those services is made contingent upon the filing of an application by such an individual—*i.e.*, the statute specifically states that services "shall be made available . . . *upon* application filed. . . ." It requires no great logical effort to conclude from this language that Congress meant for funds to be expended pursuant to section 654(6)(A) only *after* eligible non-AFDC recipients filed requisite IV–D applications with their respective states. To argue, as does New Jersey, that post-1975 applications are not explicitly necessitated by the language of the statute is to ignore the obvious implication of the words Congress chose to employ in drafting this portion of the IV–D Act. (It also is to ignore the even more precise words HHS used in drafting the administrative regulation that implements section 654(6)(A)).[13]

In response to New Jersey's related argument, that HHS should accept certain documents already on file with the State as sufficient evidence of a need for child support services on the part of non-AFDC individuals, we conclude once again that the precise words of the statute counsel otherwise. No doubt Congress could have made a state's receipt of non-AFDC-related reimbursements contingent upon the filing of a court order, a complaint, or an affidavit—documents that, presumably, New Jersey would have us deem acceptable substitutes for the statutorily prescribed "application." Section 654(6)(A), however, speaks *only* in terms of the filing of an "application"—and, as HHS observes in this connection, "[t]here is no indication in either the statute itself or the legislative history that anything other than the plain meaning of the word 'application' was intended by Congress," Brief for Respondent at 9. Moreover, the statute directs that the application for IV–D services be filed *by the non-AFDC individual* with the state. This requirement of some sort of personalized filing by the applicant in our view precludes a state from transferring its entire pre-1975 child support caseload to the IV–D program in the absence of an intervening affirmative statement on the part of each non-AFDC participant that he or she still desires to receive such aid.

The Department's interpretation of section 654(6)(A) is reinforced when the analytical focus is shifted from an examination of the precise language of the provision to a consideration of the provision's underlying general purpose. New Jersey contends that HHS' reading of section 654(6)(A) is inconsistent with the IV–D statutory scheme, if for no other reason than that a state's funds, better spent on the provision of child support services, are necessarily diverted toward the accumulation of "unnecessary" applications. See Brief for Petitioner at 12–16. We find this contention unpersuasive.

13. As mentioned previously, 45 C.F.R. § 302.-33(a) duplicates the language of 42 U.S.C. § 654(6)(A), with one important exception: whereas the statute states that IV–D applications are to be filed "with the State," the regulation directs that such applications be filed "with the IV D agency." We reject New Jersey's contention that Regulation 302.33(a) "provides mere restatement of the statutory directive," Reply Brief for Petitioner at 2. In our view, it is difficult to conceive that the regulation sanctions the use of anything other than post-1975 applications inasmuch as the regulation mandates that applications be filed with various agencies that did not even exist prior to 1975.

First, it is to be emphasized that the non-AFDC aspect of the IV–D program (and, for that matter, the IV–D program itself) represented an unprecedented federal experiment. Just as Congress insisted that certain statutory standards be satisfied by the states in order to ensure the success of the overall IV–D program, *see* 42 U.S.C. §§ 651–662, so too did Congress set forth specific requirements intended to accompany and to monitor the non-AFDC effort, *see, e.g., id.* at § 652(a) (obligating OCSE to conduct an annual audit of the non-AFDC portion of the IV–D program). Examined in this light, the application requirement of section 654(6)(A) appears not as an inexplicable aberration, but rather as the logical concomitant of a new federal program. "It seems only reasonable that individuals in need of a newly created service be asked to express a desire for the service and that such application should be contemporaneous with the availability of that service." Brief for Respondent at 11. Second, there can be little doubt that Congress was aware, prior to the enactment of the IV–D program, that a number of states, such as New Jersey, already operated their own child support and paternity programs. In fact, the perceived failure of many of these programs was a significant motivating force that led to the adoption of the Child Support Enforcement Act. *See* [1974] U.S. Code Cong. & Ad.News, *supra*, at 8145–58. Perhaps because it wished to eliminate the shortcomings in existing state child support

programs, Congress made no effort to "grandfather" any aspect of those programs into the new federal scheme. Again, given this information, it is not illogical to assume that the application requirement set forth in section 654(6)(A) was envisioned by Congress as consistent with its attempt to "require new administrative procedures . . . rather than [to] rely on pre-existing ones which generally produced an inferior result," Brief for Respondent at 12. Third, viewed with the benefit of hindsight, the new application requirement strikes us as entirely consonant with Congress' ultimate objective of reducing unnecessary welfare expenditures through the IV–D program. For a variety of reasons, *see* note 3 *supra*, New Jersey was not able to obtain signed requests for IV–D services from a significant percentage of the individuals for whom it sought reimbursement from the federal government—and this remained the case many months after the OCSE instruction had been issued, *see, e.g.,* App. at 54a. There simply is nothing in the legislation or its history to indicate that Congress wished to provide federal monies for individuals who either could not be located by a state or who, once located, refused to complete an application for IV–D services.[14]

For all of the foregoing reasons, we conclude that, in requiring states to obtain post-1975, signed applications from non-AFDC individuals receiving IV–D assistance, HHS correctly interpreted 42 U.S.C. § 654(6)(A).[15]

14. In this connection, we agree with the conclusion of the HHS Departmental Grant Appeals Board, that if, as the Fant affidavit indicates, *see* note 3 *supra*,

non-AFDC recipients refused to sign new applications on the advice of counsel, an informed decision to forgo further services was made. Since the Act provides for the furnishing of services to non-AFDC recipients only upon request, the continued provision of services under such circumstances would appear to be improper. It is not our duty to inquire into the reasons why such advice was given by counsel.

Dec. No. 135 (Nov. 28, 1980), App. at 5a.

15. Because we hold, as a matter of statutory construction, that section 654(6)(A) mandates that new IV–D applications be obtained from

non-AFDC recipients, we are unable to accede to New Jersey's request, Brief for Petitioner at 23–25, that, at a minimum, we reverse disallowances imposed by HHS as to the initial quarters during which the application requirement was enforced by HHS. We note, however, that the Grant Appeals Board found that there was "some merit" to New Jersey's contention that, despite its good faith efforts, it did not have enough time to obtain approximately 55,000 new applications between July 19, 1976, the date when the OCSE instruction was received, and August 1, 1976, the date when the disallowances commenced. Accordingly, the Board recommended that HHS, after further discussions with the State, "set another time and reduce the amount of the disallowance to the extent that it determines appropriate." Dec. No. 135 (Nov. 28, 1980), App. at 6a–7a.

## B

Even if it were concluded that section 654(6)(A) is ambiguous on its face, however, we would be constrained to decide this appeal against New Jersey. We believe that HHS had the authority, under the Administrative Procedure Act, to promulgate the application requirement contained in the OCSE program instruction as an interpretative rule.[16]

New Jersey concedes that, pursuant to 42 U.S.C. § 1302 (vesting authority in the Secretary to make and publish regulations implementing the AFDC program) and 42 U.S.C. § 654(13) (obligating states to comply with such "requirements and standards as the Secretary determines to be necessary to the establishment of an effective [IV–D] program"), HHS could have adopted an administrative regulation providing that IV–D funds be made available only to non-AFDC individuals from whom a signed, post-1975 application had been secured. The State contends, however, that such a "legislative-type" regulation could have been issued only in conformity with the notice and comment provisions of the APA, see 5 U.S.C. § 553. Because HHS provided New Jersey with no such opportunity to comment upon the OCSE transmittal before it became effective, the State argues that HHS violated the APA and that, consequently, the new application instruction should be invalidated.

■ The APA notice and comment procedures exist for good reason: to ensure that unelected administrators, who are not directly accountable to the populace, are forced to justify their quasi-legislative rulemaking before an informed and skeptical public. When these procedures are not followed in situations where they are in fact applicable, a court promotes neither the agency's ultimate mission nor respect for the law by ignoring the agency's indiscretion or condoning the agency's shortcut. The rulemaking processes set forth in the APA do not govern every action undertaken by an administrative agency, however. Specifically, 5 U.S.C. § 553(b)(A) provides that an agency need not accord interested parties an opportunity for notice and comment with respect to the promulgation of "interpretative rules." HHS asserts, not surprisingly, that the OCSE instruction at issue here constitutes an interpretative rule within the meaning of this provision and that therefore notice and comment procedures were not necessary. As previously noted, New Jersey contends, on the other hand, that HHS "in effect" has issued a legislative rule in "interpretative" clothing.

■ This Court has attempted to identify the definitional and practical differences between legislative and interpretative rulemaking on a number of recent occasions. See Cerro Metal Products v. Marshall, 620 F.2d 964, 981–82 (3d Cir. 1980); Buczynski v. General Motors Corp., 616 F.2d 1238, 1242 (3d Cir.), cert. denied, 448 U.S. 911, 101 S.Ct. 25, 65 L.Ed.2d 1141 (1980); Baker v. Otis Elevator Co., 609 F.2d 686, 691 (3d Cir. 1979); Daughters of Miriam Center for the Aged v. Mathews, 590 F.2d 1250, 1258–59 (3d Cir. 1978). In light of our previous decisions, we believe it unnecessary to consider the question once again in any detail. In brief, a "legislative rule is the product of an exercise of delegated legislative power to make law through rules," whereas an "interpretative rule is any rule an agency issues without exercising delegated legislative power to make law through rules." 2 K. Davis, Administrative Law Treatise 36 (1979). Expressed somewhat differently, an interpretative rule is a "statement[ ] made by an agency to give guidance to its staff and affected parties as to how the

After New Jersey filed these petitions for review, OCSE regional officials notified the State that September 1, 1976, had been established as the date by which valid IV–D applications should have been secured. New Jersey received credit, therefore, for disallowances previously entered for August 1976. Letter from

J. Steigman, Regional Representative, OCSE (July 30, 1981), Supp.App. at 25a–26a.

16. We note that the Grant Appeals Board disposed of New Jersey's petition for reconsideration on precisely this ground. See Dec. No. 135 (Nov. 28, 1980), App. at 2a–3a.

agency intends to administer a statute or regulation." *Daughters of Miriam Center, supra,* 590 F.2d at 1258; *see Pickus v. United States Board of Parole,* 507 F.2d 1107, 1113 (D.C.Cir.1974); *Haddon Township Board of Education v. New Jersey Department of Education,* 476 F.Supp. 681, 691 (D.N.J.1979). In contrast, a legislative rule, rather than merely setting forth an agency's own interpretation of the meaning of a statute it administers, actually implements that statute and, in so doing, "creates" new law "affecting individual rights and obligations." *Morton v. Ruiz,* 415 U.S. 199, 232, 94 S.Ct. 1055, 1073, 39 L.Ed.2d 270 (1974); *see Chrysler Corp. v. Brown,* 441 U.S. 281, 301–03, 99 S.Ct. 1705, 1717–1718, 60 L.Ed.2d 208 (1979); *National Association of Insurance Agents, Inc. v. Board of Governors, Federal Reserve System,* 489 F.2d 1268, 1270–71 (D.C.Cir.1974).

In our view, the OCSE "program instruction" under review on this appeal constitutes an interpretative rule for two reasons. First, in announcing the need for states to secure signed, post-1975 applications from non-welfare recipients of IV–D services, HHS was not imposing a new, substantive requirement upon the states. Rather, the agency was merely attempting to interpret a discrete provision of the Child Support Enforcement Act, *i.e.,* it was attempting to flesh out the implicit mandates of 42 U.S.C. § 654(6)(A). We agree with HHS that "[t]he only questions left open by the statutory language [of section 654(6)(A) are] administrative [questions] such as the format and timeliness of the required application." Brief for Respondent at 9. Relatively technical, unimportant considerations such as these are appropriately resolved through the promulgation of an interpretative rule. Second, in *Cerro Metal Products, supra,* we advised that, in distinguishing between interpretative and legislative rules, a court should "take the agency at its word." 620 F.2d at 981. That is, "[i]f an agency that has the statutorily delegated power to issue legislative rules chooses instead to issue an interpretative rule, the court accepts that characterization of the rule," *id.; see Daughters of Miriam Center, supra,* 590 F.2d at 1255 n.9, 1258–59; *Joseph v. United States Civil Service Commission,* 554 F.2d 1140, 1153 n.24, 1154 n.26 (D.C.Cir.1977). *Cerro Metal Products* therefore provides an additional justification for concluding that the OCSE application instruction involved here is properly classified, for our purposes, as an interpretative rule.

■ The standard of review that should be applied by a court in evaluating an interpretative rule is, at least in this Circuit, a settled question. Interpretative rules are "not controlling upon the courts" [quoting *United States v. Pennsylvania Industrial Chemical Corp.,* 411 U.S. 655, 674, 93 S.Ct. 1804, 1816, 36 L.Ed.2d 567 (1973) ] inasmuch as they are not promulgated pursuant to a delegation by Congress of authority to legislate. Instead, courts remain free to substitute their judgment for that of the agency in determining how the statute or regulation is to be implemented.

*Daughters of Miriam Center, supra,* 590 F.2d at 1258; *see Cerro Metal Products, supra,* 620 F.2d at 981–82; *Buczynski v. General Motors Corp., supra,* 616 F.2d at 1242; *Baker v. Otis Elevator Co., supra,* 609 F.2d at 691; *see also Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944) (identifying certain factors to be weighed in this connection). This seemingly broad-sweeping statement must be qualified in two related respects, however, lest the conclusion be drawn that courts enjoy a license to substitute their own predilections for admittedly valid interpretations of a statute arrived at by an agency. First, the Supreme Court has repeatedly instructed that "great deference" be accorded "the interpretation given [a] statute by the officers or agency charged with its administration." *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *see EPA v. National Crushed Stone Association,* 449 U.S. 64, 83, 101 S.Ct. 295, 306, 66 L.Ed.2d 268 (1980); *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980); *Miller v. Youakim,* 440 U.S. 125, 144 n.25, 99 S.Ct. 957, 968, 59 L.Ed.2d 194 (1979); *Zenith*

*Radio Corp. v. United States*, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978); *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 274–75, 94 S.Ct. 1757, 1761–1762, 40 L.Ed.2d 134 (1974). Second, the Court has cautioned, albeit in a context not directly involving interpretative rulemaking, that to sustain an agency's interpretation of a statutory term, a court

> need not find that [the agency's] construction is the only reasonable one, or even that it is the result [the court] would have reached had the question arisen in the first instance in judicial proceedings. . . . All that is needed to support the [agency's] interpretation is that it has "warrant in the record" and a "reasonable basis in law."

*Unemployment Compensation Commission of Alaska v. Aragon*, 329 U.S. 143, 153–54, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946).

Applying these principles to the present appeal, we conclude, that the interpretative rule set forth by HHS in the OCSE transmittal constitutes a valid exercise of administrative authority. First, in accordance with our earlier analysis, we are of the opinion that the agency correctly interpreted the language of 42 U.S.C. § 654(6)(A) insofar as it relates to the filing of new applications. In "substitut[ing our] judgment for that of the agency in determining how the statute . . . is to be implemented," then, we arrive at precisely the same result as did HHS: that signed, post-1975 applications are necessary under the Act. Second, even were we less convinced that section 654(6)(A), on its face, requires that new applications be obtained from non-AFDC individuals, we would be inclined to defer to the interpretation given the Child Support Enforcement Act by HHS, the "agency charged with its administration." None of the previously discussed arguments proffered by New Jersey persuades us that HHS' new application requirement, even if not directly mandated by the Act, is in any way inconsistent with or inimical to the overall IV–D scheme envisioned and enacted by Congress.[17] Having reached such a conclusion, our inquiry is at an end. New Jersey's contention that the OCSE instruction should be invalidated because "there appears to be no rational basis" why certain pre-1975 documents (*e.g.*, court orders) would not suffice for IV–D application purposes, Brief for Petitioner at 15–16, fundamentally misperceives the scope of our review with respect to interpretative rules. Having determined that HHS' construction of section 654(6)(A) has a "reasonable basis in law," we are not at liberty to adopt the alternative reading urged by New Jersey, however rational or desirable its likely result.

We hold, therefore, that whether or not the language of 42 U.S.C. § 654(6)(A) is construed as specifically conferring power on HHS to require new applications, HHS had sufficient authority, pursuant to its own interpretative rule, to deny reimbursement to New Jersey for IV–D services provided to non-AFDC individuals from whom no application has been obtained.

## V

For the foregoing reasons, the orders of the HHS Departmental Grant Appeals Board will be affirmed and the petitions for review will be denied.

---

17. *Compare Reser v. Califano*, 467 F.Supp. 446 (W.D.Mo.1979), where the court invalidated a legislative regulation after finding it not " 'reasonably related to the purposes of the enabling legislation,' " *id.* at 450, quoting *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973). We agree with the HHS Departmental Grant Appeals Board that "*Reser* can be distinguished from the instant case . . . since the Agency in *Reser* did not purport to derive the prohibition [contained in the regulation under review] from any specific language in the Act." Dec. No. 135 (Nov. 28, 1980), App. at 4a.